**CONTINENTAL OIL COMPANY et al.,**
**Appellants-Appellees,**

v.

**The LONDON STEAM–SHIP OWNERS'**
**MUTUAL INSURANCE ASSOCIA-**
**TION, Ltd., Appellee-Appellant.**

**The LONDON STEAM–SHIP OWNERS'**
**MUTUAL INSURANCE ASSOCIA-**
**TION, Ltd., Appellee-Appellant,**

v.

**CONTINENTAL OIL COMPANY et al.,**
**Appellants-Appellees.**

**No. 25372.**

United States Court of Appeals
Fifth Circuit.

Sept. 23, 1969.

Joseph Newton, Houston, Tex., William R. Tete, Lake Charles, La., for appellant; Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., Jones, Kimball, Harper, Tete & Wetherill, Lake Charles, La., of counsel.

George W. Renaudin, David B. Connery, Jr., Houston, Tex., Edgar F. Barnett, Lake Charles, La., for appellee; Royston, Rayzor & Cook, Houston, Tex., Hall, Raggio, Farrar & Barnett, Lake Charles, La., of counsel.

Before JOHN R. BROWN, Chief Judge, DYER, Circuit Judge, and GARZA, District Judge.

JOHN R. BROWN, Chief Judge:

Although this case involves a collision between the S/S Kimon and Continental Oil Company's drilling and production platform fixed on the Outer Continental Shelf in the Gulf of Mexico off the coast of Louisiana, that is the simplest thing about the litigation. What complicates it is not necessarily the United Nations complexion of the ship's company or notions of flag of convenience,[1] or the involvement of British underwriters[2] whose mere mention evokes the strong exciting aroma of Lloyds' Coffee House. The complication comes from a Louisiana statute ostensibly designed to protect the public but long thought of in some quarters as a neat way to gain, through diversity jurisdiction, the benefit of a Seventh Amendment Federal Court jury trial in a civil law state where a jury's verdict carried no more, if as much, appellate weight than that of a Judge.[3] It is known as the Direct Action Statute[4] and legislatively ex-

---

1. Leedom v. Kyne, 1958, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210. The ship, owned by Evangelista Shipping Corp. (Shipowner), a Liberian Corporation, was manned by a Greek crew.

2. Presumably to localize it in Louisiana terms, the insurer is characterized as an entity insuring the liabilities of the vessel. Undoubtedly the underwriter more truly bears the felicitous name of a "P & I Club", 1. J. Arnould, Marine Insurance § 80 (13th ed. 1950); F. Templeman & C. Greenacre, Marine Insurance § 294 (4th ed. 1934), since the collision was with a fixed object, not another vessel, which would have precipitated a claim under the Four/Fourths Running Down Clause of a Hull policy. See 1. J. Arnould, *supra* at § 81; F. Templeman & C. Greenacre, *supra* at 294. See also, Nardelli v. Stuyvesant Ins. Co., 5 Cir., 1958, 258 F.2d 718, 1958 A.M.C. 2404, on second petition for rehearing, 5 Cir., 1959, 269 F.2d 592.

3. See Lumbermen's Mut. Cas. Co. v. Elbert, 1954, 348 U.S. 48, 75 S.Ct. 151, 99 L.Ed. 59; Watson v. Employers Liab. Assur. Corp., 1954, 348 U.S. 66, 75 S.Ct. 166, 99 L.Ed. 74.

For diversity it is a "beaten enemy". Coleman v. Jahncke Service, Inc., 5 Cir., 1965, 341 F.2d 956, 961, n. 15, cert. denied, Jahncke Service, Inc. v. Greater New Orleans Expressway Commission, 1966, 382 U.S. 974, 86 S.Ct. 538, 15 L.Ed.2d 465; 1964 Amendment 28 U.S.C.A. § 1332.

4. The statute provides:

"No policy or contract of liability insurance shall be issued or delivered in this state, unless it contains provisions to the effect that the insolvency or bankruptcy of the insured shall not release the insurer from the payment of damages for injuries sustained or loss occasioned during the existence of the policy, and any judgment which may be rendered against the insured for which the insurer is liable which shall have become executory, shall be deemed prima facie evidence of the insolvency of the insured, and an action may thereafter be maintained within the terms and limits of the policy by the injured person, or his or her survivors mentioned in Revised Civil Code Article 2315, or heirs against the insurer. The injured person or his or her survivors or heirs hereinabove referred to, at their option, shall have a right of direct action against the insurer within the terms and limits of the policy; and such action may be brought against the insurer alone, or against both the insured and insurer jointly and in solido, in the parish in which the accident or injury occurred or in the parish in which an action could be brought against either the insured or the insurer under the general rules of venue prescribed by Art. 42, Code of Civil Procedure. This right of direct action shall exist wheth-

punges the traditional "no action" clause of a liability policy to permit a party injured in Louisiana to sue the liability insurer directly without going through the process of suit and judgment against the Assured.

Like so much legal jousting, the principle may be worth more than the principal. This is just one more of the irrepressible efforts to force a Delphic answer to what fifteen years later has perhaps turned out to be something less than the riddle[5] or "grisly spectre"[6] supposed.[7] About the only new wrinkle, cf. Mike Hooks, Inc. v. Pena, 5 Cir., 1963, 313 F.2d 696, 1963 A.M.C. 355, is that here the occurrence takes place on, over, or around the high seas many miles beyond even the most extravagant of Louisiana claims of territorial sovereignty but within the area characterized as the Outer Continental Shelf by the Congressional Act[8] that sought to compromise, if not solve, the rich intramural controversy over oil in the tidelands.

What brings this all about is the damage caused when S/S Kimon, an ocean going vessel, collided with the offshore drilling platform rigged for the exploration for and production of oil, which was fixed to the ocean's floor in the Outer Continental Shelf. The occurrence, although formerly perhaps a nonmaritime claim, was clearly a maritime claim under the Extension of Admiralty Jurisdiction Act.[9] And it

er the policy of insurance sued upon was written or delivered in the State of Louisiana or not and whether or not such policy contains a provision forbidding such direct action, provided the accident or injury occurred within the State of Louisiana. Nothing contained in this Section shall be construed to affect the provisions of the policy or contract if the same are not in violation of the laws of this State. It is the intent of this Section that any action brought hereunder shall be subject to all of the lawful conditions of the policy or contract and the defenses which could be urged by the insurer to a direct action brought by the insured, provided the terms and conditions of such policy or contract are not in violation of the laws of this State.

It is also the intent of this Section that all liability policies within their terms and limits are executed for the benefit of all injured persons, his or her survivors or heirs, to whom the insured is liable; and that it is the purpose of all liability policies to give protection and coverage to all insureds, whether they are named insured or additional insureds under the omnibus clause, for any legal liability said insured may have as or for a tortfeasor within the terms and limits of said policy."
LRS 22:655.

5. Guillot v. Cenac Towing Co., 5 Cir., 1966, 366 F.2d 898, 1966 A.M.C. 2685; Ex Parte Tokio Marine Ins. Co., 5 Cir., 1963, 322 F.2d 113, 1964 A.M.C. 308.

6. Coleman v. Jahncke Service, Inc., 1965, 341 F.2d 956, 957, 1966 A.M.C. 1115, cert. denied, 1966, 382 U.S. 974, 86 S.Ct. 538, 15 L.Ed.2d 465.

7. Olympic Towing Corp. v. Nebel Towing Co., Inc., 5 Cir., 1969, 419 F.2d 230, A.M.C. [July 9, 1969] holds that for a Louisiana inland based maritime occurrence the direct action Insurer has a direct liability beyond that of the Shipowner held to be entitled to limit liability, 46 U.S.C.A. §§ 181 et seq.

8. The Outer Continental Shelf Lands Act, 43 U.S.C.A. § 1331 et seq.

9. "The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.

In any such case suit may be brought in rem or in personam according to the principles of law and the rules of practice obtaining in cases where the injury or damage has been done and consummated on navigable water: Provided, That as to any suit against the United States for damage or injury done or consummated on land by a vessel on navigable waters, the Public Vessels Act or Suits in Admiralty Act, as appropriate, shall constitute the exclusive remedy for all causes of action arising after June 19, 1948, and for all causes of action where suit has not been hitherto filed under the Federal Tort Claims Act: Provided further, That no suit shall be filed against the United States until there shall have expired a period of six

was so treated by Shipowner and drilling platform owner alike.[10] With no indication then, since, or now that the admiralty remedies were in any way incomplete, inconvenient or unavailable[11] —either substantively or procedurally— the platform owner filed the instant suit in the Louisiana Federal Court against Shipowner's underwriter under the Louisiana Direct Action Statute (note 4, *supra*) to recover the identical damages occasioned by the fault of S/S Kimon, her owners, etc. In response to the defendant underwriter's motions[12] the Court dismissed the Louisiana direct action suit. Giving the maritime shoals (see notes 5, 6, and 7, *supra*) a wide berth, this knowledgeable Louisiana Admiralty Judge set his course solely on Louisiana law. He held that since the accident happened outside of Louisiana, and the Louisiana Courts had held that the Direct Action Statute would not be given extra-territorial effect, the Statute did not apply.

That destination was correct and we affirm, although the course was wrong since the dead reckoning did not reckon with the Outer Continental Shelf Lands Act and specifically whether under it Louisiana's Direct Action Statute has been adopted as federal law and made applicable to this case.[13] Disclaiming any prescience superior to that of the Trial Judge, Williams v. United States, 5 Cir., 1968, 405 F.2d 234, 239, the course has been plotted for us by the stellar-aided inertial guidance system of the recent intervening decision in Rodrigue v. Aetna Cas. & Sur. Co., 1969, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360.

The problem facing Congress in establishing a statutory structure for Outer Continental Shelf Lands was what law should be prescribed. The Court in *Rodrigue* traces the ebb and flow of legislative tides from which came the scheme of federal adoption of applicable adjacent state law as binding federal law. Under this scheme federal law and jurisdiction

months after the claim has been presented in writing to the Federal agency owning or operating the vessel causing the injury or damage."
46 U.S.C.A. § 740.

10. The platform owner filed a libel *in rem* against S/S Kimon in the Federal District Court in Texas and presumably obtained security under the traditional stipulation (bond) to release the vessel from seizure. Shipowner filed a petition for limitation of liability, 46 U.S.C.A. § 181 et seq., Adm.R.F. (4), in which the platform owner filed a claim and Shipowner filed a cross claim against the platform owner under the Duke of York, British Transport Comm'n v. United States, 1957, 354 U.S. 129, 77 S.Ct. 1103, 1 L.Ed.2d 1234, 1957 A.M.C. 1151.

11. By supplemental stipulation subsequent to argument we are informed that the parties have dismissed the admiralty proceedings in Texas (note 10, *supra*) under a settlement in which Shipowner paid $147,500 of the platform owner's agreed damages of $247,500. It was expressly stipulated that the collision "was proximately caused by the sole fault and neglect of the S/S Kimon and those in charge of her, with the privity and knowledge of" Shipowner. That litigation

"has been dismissed without prejudice to this action" now before us.

The parties by supplemental briefs also spell out that the question subsequently resolved in Olympic Towing, (note 7, *supra*) as to the liability of the direct insurer in excess of the Shipowner's limited liability, is no longer in the case.

12. We have not assayed underwriter's attack on its amenability to service of process.

13. Without more we reject again, as so often and most recently done in *Olympic Towing*, the underwriter's plea that we reconsider these earlier decisions: Coleman v. Jahncke Serv., Inc., 5 Cir., 1965, 341 F.2d 956, 960–961, cert. denied, 1966, 382 U.S. 974, 86 S.Ct. 538, 15 L.Ed.2d 465; Loveless v. Employers' Liab. Assurance Corp., 5 Cir., 1955, 218 F.2d 714; Cushing v. Maryland Cas. Co., 5 Cir. 1952, 198 F.2d 536, 538, vacated, 1954, 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806.

They urge that the terms "ocean marine" in LRS 22:655 and "marine insurance" in LRS 22:1252 compel a determination that Louisiana intended to exclude marine insurance from the Direct Action Statute.

are the sole sources of governmental power [14] with that federal law coming from (i) federal law and (ii), where applicable, law of the adjacent state.[15]

The Court summed up the legislative process, objective and result in this way:

The purpose of the Outer Continental Shelf Lands Act was to define a body of law applicable to the seabed, the subsoil, and the fixed structures such as those in question here on the outer Continental Shelf. That this law was to be federal law of the United States, applying state law only as federal law and then only when not inconsistent with applicable federal law, is made clear by the language of the Act. Section 3 makes it the "policy of the United States" that the affected areas "appertain to the United States and are subject to its jurisdiction, control, and power of disposition." Section 4 makes the "Constitution and laws and civil and political jurisdiction of the United States" apply "to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State." Since Federal law, because of its limited function in a federal system, might be inadequate to cope with the full range of potential legal problems, the Act supplemented gaps in the federal law with state law through the "adoption of state law as the law of the United States." Under § 4, the adjacent State's laws were made "the law of the United States for [the relevant subsoil and seabed] and artificial islands and fixed structures erected thereon," but only to "the extent that they are

14. The jurisdictional approach Congress used is best illustrated by the language of the Outer Continental Shelf Lands Act itself:

"It is declared to be the policy of the United States that the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition as provided in this subchapter."

43 U.S.C.A. § 1333(a), and

"Constitution and United States laws; laws of adjacent States; publication of projected State lines; restriction on State taxation and jurisdiction.

"The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands and fixed structures which may be erected thereon for the purpose of exploring for, developing, removing, and transporting resources therefrom, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State: *Provided, however,* That mineral leases on the outer Continental Shelf shall be maintained or issued only under the provisions of this subchapter."

43 U.S.C.A. § 1333(a) (1).

For references to the Congressional debates involving this concept see *Rodrigue, supra* at 365–366, 89 S.Ct. 1835.

15. Outer Continental Shelf Lands Act also provides:

"To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State as of [the effective date of this subchapter] are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf, and the President shall determine and publish in the Federal Register such projected lines extending seaward and defining each such area. All of such applicable laws shall be administered and enforced by the appropriate officers and courts of the United States. State taxation laws shall not apply to the outer Continental Shelf.

"The provisions of this section for adoption of State law as the law of the United States shall never be interpreted as a basis for claiming any interest in or jurisdiction on behalf of any State for any purpose over the seabed and subsoil of the outer Continental Shelf, or the property and natural resources thereof or the revenues therefrom."

43 U.S.C.A. § 1333(a) (2), (3).

applicable and not inconsistent with * * * other Federal laws."

It is evident from this that federal law is "exclusive" in its regulation of this area, and that state law is adopted only as surrogate federal law. 395 U.S. at 355, 356–357, 89 S.Ct. at 1837–1838, 23 L.Ed.2d at 364–365. But the result obtained because there (i) was *no* federal law and (ii) there was a state law covering the precise situation.

How different is our case. The damage was caused by collision of S/S Kimon with the structure itself and "when the damage is caused by a vessel admittedly in admiralty jurisdiction, the Admiralty Extension Act [see note 9, *supra*] would now make available the admiralty remedy in any event." *Rodrigue, supra*, at 395 U.S. 360, 89 S.Ct. 1839, 23 L.Ed.2d 367.

Thus there was a fully effective maritime right and remedy. (See note 10, *supra*.) In this situation is adjacent Louisiana law needed or permitted?

Whether intended as the analytical course in every instance, the Court in *Rodrigue* started with the inquiry: Was there a federal law? Finding none— which eliminated also the question of inconsistency—the state law which pertained to the occurrence became the exclusive federal law. It could readily do this: On accepted maritime principles for deaths resulting from accidents occurring completely on these "artificial islands", the Death on the High Seas Act —"of its own force under admiralty principles"—did not apply and "the Lands Act deliberately eschewed the application of admiralty principles to these novel structures." *Rodrigue, supra* at 395 U. S. 355, 89 S.Ct. 1837, 23 L.Ed.2d 364. In terms of Congressional divination the query technically turns on the meaning to be given "applicable" since adjacent

laws become federal law only to "the extent that [i] they are applicable and [ii] not inconsistent with * * * Federal laws * * *." 43 § 1333(a) (2), (see note 15, *supra*).

The platform owner contends that the term "applicable" as used in the Outer Continental Shelf Lands Act "can only mean applicable to the subject matter in question." And, the argument continues, since this is a suit involving a policy of liability insurance, the Direct Action Statute by its terms covers that very situation. Thus the Direct Action Statute is "applicable" within the meaning of the Act, and being "applicable" affords its own direct relief.

On such reading the necessity for state law (in the sense of a right being lost in its absence) is not the significant factor. State law becomes merely a matter of affording some gain or benefit or advantage not available if state law can not be invoked. Such a reading, of course, puts almost 100% emphasis on the "not inconsistent * * * with federal laws" element of § 1333(a) (2)—a problem which the platform owners circumnavigate by not only moving the Louisiana law out to sea but moving the occurrence back into Louisiana as though it had taken place on inland waters.[16] That is a lot of fictionalizing. And in more austere words it imputes to Congress the purpose generally to export the whole body of adjacent law onto the Outer Continental Shelf for automatic application to any and all occurrences *unless*—with the *unless* being limited to (a) specific provisions within the Act [17] or (b) inconsistent federal law. By whatever characterization expressed, in determining what law is to govern, that approach accords initially a superiority to adjacent state law—the question of federal law comes into play only after

16. They rely on our cases, notes 5, 6, 7, and 13, *supra*, in which we have repeatedly (and recently) held that the Direct Action Statute does apply to maritime cases occurring on inland navigable waters, and its application does not disturb the essential uniformity of the admiralty.

17. An illustration is the express adoption, § 1333(c), of the Longshoremen's Act 33 U.S.C.A. § 901 *et seq.* rather than the Louisiana Compensation Act for injuries to employees.

this process excludes state law. This is hardly in keeping with the course of legislative history in which the notion of supremacy of state law administered by state agencies was expressly rejected.[18]

Keeping in mind that the tidelands controversy [19] had deep political and emotional currents centered around the clash between national sovereignty and states' rights—a dispute in which geography separated the adversaries as inland states sought compensating advantages to offset those claimed by coastal states as historically and exclusively theirs [20]—the deliberate choice of federal law, federally administered,[21] requires that "applicable" be read in terms of necessity—necessity to fill a significant void or gap.

This is the recurring theme of *Rodrigue*. Thus, early in the opinion the Court states since "Federal law, because of its limited function in a federal system, might be inadequate to cope with the full range of potential legal problems, the Act supplemented *gaps* in the federal law with state law through the 'adoption of State law as the law of the United States'." 395 U.S. at 357, 89 S.Ct. at 1838, 23 L.Ed.2d at 365 (emphasis added).

Again after referring to the Committee report which stated that "Paragraph (2) adopts State law as Federal law, to be used when Federal statutes or regulations of the Secretary of the Interior are inapplicable," [22] Mr. Justice White summed it up for the Court emphatically.

"This language makes it clear that state law could be used to *fill* federal *voids*." 395 U.S. at 358, 89 S.Ct. at 1838, 23 L.Ed. 2d at 365 (emphasis added).

This approach was reflected by the statements of Senators Cordon, who presented the Act to the Senate, and Anderson, a member of the Conference Committee: "As Senator Anderson, a member of the conference committee, put it: 'The real point is * * * that the language in section 4 provides that Federal laws and regulations shall be applicable in the area, but that *where there is a void, the State law may be applicable* * * *.' Remarks of Senator Anderson, 99 Cong. Rec. 7164. Senator Cordon noted that this view was 'entirely correct' and added that 'These laws, by the terms of the act, are enacted as Federal law.'" *Rodrigue, supra,* 395 U.S. at 358, 89 S.Ct. at 1838, 23 L.Ed.2d at 365–366 (emphasis added).

Of course there is no such necessity here. The collision was a classic maritime case within the validly extended Admiralty jurisdiction in which both substantive rights and remedies (see note 9, *supra.*) were quite ample. There is no void, there are no gaps. If there were, the Admiralty, under the guidance of a Judge having all of the flexibility of a sea-going Chancellor, *cf.* Hadjipateras v. Pacifica, S.A., 5 Cir., 1961, 290 F.2d 697, 1961 A.M.C. 1417, has adequate resourc-

---

18. See *Rodrigue, supra* where the Court said:

"The opponents of the Act realized full well that state law was being used only to supplement federal law, and Senator Long introduced an amendment to the Act which would have made 'the laws of each State applicable to the newly acquired area, and * * * the officials of such State [the agents empowered] to enforce the laws of the State in the newly acquired area.' In arguing for his amendment, Senator Long asserted that '[i]t is even more important that State law should apply on the artificial islands than on natural islands * * *.' But the

amendment was rejected. See 99 Cong. Rec. 7232–7236."
395 U.S. at 358, 89 S.Ct. at 1839, 23 L.Ed.2d at 344.

19. See United States v. California, 1947, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889.

20. See United States v. Louisiana, 1950, 339 U.S. 669, 70 S.Ct. 914, 94 L.Ed. 1216; United States v. Texas, 1950, 339 U.S. 707, 70 S.Ct. 918, 94 L.Ed. 1221.

21. §§ 1332(a), 1333(a) (1), notes 14 and 15, *supra*.

22. Report of the Senate Committee on Interior and Insular Affairs, S.Rep. No. 411, 83d Cong., 1st Sess. 23 (1953).

es[23] without calling on adjacent state law.

This approach likewise makes something more out of the "not inconsistent" element of § 1333(a) (2) than a mere disjunctive for mechanical invocation and assessment. In determining whether it is appropriate to call in adjacent state law, it permits an analysis in the light of the interests sought to be served in the domestic intramural contest over the oil rich tidelands without disturbing interests of an International character having equal, if not greater importance in a day in which an incident on the High Seas may trigger a fissioned Armaggedon.

Both by the terms of the Outer Continental Shelf Lands Act and by International convention, sovereignty of the adjacent nation (not subsidiary state) is a "horizontal" one limited to the seabed and structures fixed thereon[24] with full freedom of the seas accorded to all nations in the surrounding waters.[25]

The United States has interests in its relations to other nations quite different from those among its own several states. Thus, while it does not offend the constitutional imperative for the uniformity of admiralty[26] for the Louisiana Direct Action Statute to apply to maritime cases occurring on inland waters of Louisiana,[27] quite different considerations enter in mandatorily applying that to some —but a very select class—cases on the Outer Continental Shelf. The class is select in the sense that it must somehow be physically-causally related to the structure ("artificial island") without which Louisiana law is as irrelevant as that of Pakistan. This has nothing to do with so-called Louisiana interests. For no matter how closely related to Louisiana interests, for example, of local ownership of vessels involved, the Louisiana residence of operating crew members, performance of specific work for Louisiana based concerns, the transportation of men or materials to and from Outer Continental Shelf Land drilling sites, or the like, the Direct Action Statute could not be invoked for any one of a countless variety of maritime cases—collision, capsizing, personal injury, cargo loss—un-

23. See, e. g., Tri-State Oil Tools Indus., Inc. v. Delta Marine Drilling Co., 5 Cir., 1969, 410 F.2d 178, 186; The Hudson, S.D.N.Y., 1883, 15 F. 162.

24. § 1332. "Congressional declaration of policy; jurisdiction; construction
(a) It is declared to be the policy of the United States that the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition as provided in this subchapter."
This is reiterated in § 1333(a) (1) note 14, *supra.* See Guess v. Reed, 5 Cir., 1961, 290 F.2d 622, cert. denied, 368 U.S. 957, 82 S.Ct. 394, 7 L.Ed. 2d 388.

25. "This subchapter shall be construed in such manner that the character as high seas of the waters above the outer Continental Shelf and the right to navigation and fishing therein shall not be affected." 43 U.S.C.A. § 1333(b).
See Atlantis Development Corp. v. United States, 5 Cir., 1967, 379 F.2d 818, 827–828, n. 27 reading:
"Treaties and Other International Acts Series No. 5578 (1964), adopted at Geneva April 29, 1958, signed on behalf of the United States September 15, 1958, approved by the Senate on May 26, 1960 (106 Cong.Rec. 11182–83) ratified by the President on March 24, 1961 (44 State Dep't Bull. 609) and entered into force June 10, 1964 (50 State Dep't Bull. 946).
'The Convention provides:
'Article 2.
'1. The coastal State exercises the continental shelf sovereign rights for the purpose of exploring it and exploiting its natural resources * * *.' "

26. *See, e. g.*, Southern Pacific Co. v. Jensen, 1917, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086; Wilburn Boat Co. v. Fireman's Fund Ins. Co., 1955, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337; G. Gilmore & C. Black, Admiralty §§ 1–17 at 43–44 (1957). *Cf.* Huron Portland Cement Co. v. City of Detroit, 1960, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852, 1960 A.M.C. 1549.

27. See note 6 and 13, *supra.*

less there is a causal connection with the fixed structure.

Since this demonstrates that Louisiana interests in *maritime cases* could not have been a matter of Congressional concern in its pattern of physically-restricted-adoptive law, in assaying congressional purpose the focus must be on National and International interests.

This brings into play both physical and legal factors. For these waters not only are legally "high seas" (see note 25, *supra*), they are in fact "high seas." [28] This means that these structures may be,

28. The shoreward boundary of the Outer Continental Shelf is the most seaward boundary of United States navigable waters over submerged lands. 43 U.S.C.A. § 1331(a) provides:

"The term 'outer Continental Shelf' means all submerged lands lying seaward and outside of the area of lands beneath navigable waters as defined in section 1301 of this title, and of which the subsoil and seabed appertain to the United States and are subject to its jurisdiction and control;"

43 U.S.C.A. § 1301, The Submerged Lands Act provides:

Definitions

When used in this chapter—

(a) The term "lands beneath navigable waters" means—

(1) all lands within the boundaries of each of the respective States which are covered by nontidal waters that were navigable under the laws of the United States at the time such State became a member of the Union, or acquired sovereignty over such lands and waters thereafter, up to the ordinary high water mark as heretofore or hereafter modified by accretion, erosion, and reliction;

(2) all lands permanently or periodically covered by tidal waters up to but not above the line of mean high tide and seaward to a line three geographical miles distant from the coast line of each such State and to the boundary line of each such State where in any case such boundary as it existed at the time such State became a member of the Union, or as heretofore approved by Congress, extends seaward (or into the Gulf of Mexico) beyond three geographical miles, and

(3) all filled in, made, or reclaimed lands which formerly were lands beneath navigable waters, as hereinabove defined;

(b) The term "boundaries" includes the seaward boundaries of a State or its boundaries in the Gulf of Mexico or any of the Great Lakes as they existed at the time such State became a member of the Union, or as heretofore approved by the Congress, or as extended or confirmed pursuant to section 1312 of this title but in no event shall the term "boundaries" or the term "lands beneath navigable waters" be interpreted as extending from the coast line more than three geographical miles into the Atlantic Ocean or the Pacific Ocean, or more than three marine leagues into the Gulf of Mexico;

(c) The term "coast line" means the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters;

(d) The terms "grantees" and "lessees" include (without limiting the generality thereof) all political subdivisions, municipalities, public and private corporations, and other persons holding grants or leases from a State, or from its predecessor sovereign if legally validated, to lands beneath navigable waters if such grants or leases were issued in accordance with the constitution, statutes, and decisions of the courts of the State in which such lands are situated, or of its predecessor sovereign: *Provided, however,* That nothing herein shall be construed as conferring upon said grantees or lessees any greater rights or interests other than are described herein and in their respective grants from the State, or its predecessor sovereign;

(e) The term "natural resources" includes, without limiting the generality thereof, oil, gas, and all other minerals, and fish, shrimp, oysters, clams, crabs, lobsters, sponges, kelp, and other marine animal and plant life but does not include water power, or the use of water for the production of power;

(f) the term "lands beneath navigable waters" does not include the beds of streams in lands now or heretofore constituting a part of the public lands of the United States if such streams were not meandered in connection with the public survey of such lands under the laws of the United States and if the title to the beds of such streams was lawfully patented or conveyed by the United States or any State to any person;

(g) The term "State" means any State of the Union;

(h) The term "person" includes, in addition to a natural person, an association,

and often are,[29] far from the adjacent shore in the very track of merchantmen of all flags and of all nations plying recognized sea lanes of the Atlantic, Pacific and Gulf of Mexico.[30]

The major part of this traffic will have no concern with the particular adjacent state within whose artificial extended boundaries the structure happens to be. Many will be foreign flag vessels bound from a foreign place to an American port in a non-adjacent state. Many will be foreign flag ships en route to distant ports by way of the Panama Canal. Many will be American flag ships, cargo or tanker, under registry, 46 U.S.C.A. § 11, trading to and from foreign ports.

Others will be American flag vessels, especially tankers under enrollment, 46 U.S.C.A. §§ 251, 259, 278, in the coastwise or intercoastal trade between United States ports in non-adjacent states.[31]

In the midst of all this traffic to which the Outer Continental Shelf Lands Act and International Convention (see notes 24, and 25) assure full, traditional freedom of the seas, it is unthinking that Congress ever remotely considered—even for the briefest moment—that by the rare coincidence of hitting a structure located 50 miles off shore Louisiana a local, non-maritime Louisiana statute could leap this distance to subject a foreign vessel owner [32] and her foreign, but amenable,[33] underwriters to a suit in a

a State, a political subdivision of a State, or a private, public, or municipal corporation.

29. The platform involved here was about 50 miles off shore Louisiana. And in a case which likely founders under *Rodrigue*, the platform was 65 miles off Louisiana. Pure Oil Co. v. Snipes, 5 Cir., 1961, 293 F.2d 60, 1961 A.M.C. 1651.

30. Protection of navigation and safety at sea was a major specific concern to be regulated exclusively by federally enacted law.
43 U.S.C.A. § 1333(e) (1):
"The head of the Department in which the Coast Guard is operating shall have authority to promulgate and enforce such reasonable regulations with respect to lights and other warning devices, safety equipment, and other matters relating to the promotion of safety of life and property on the islands and structures referred to in subsection (a) of this section or on the waters adjacent thereto, as he may deem necessary."
The Coast Guard has promulgated extensive regulations covering such things as lights, fog signals, identification marks, guards and rails, communication equipment, fire fighting equipment, and life boats. See 33 CFR 140.01–146.05–30. See also § 1333(f):
"(f) The authority of the Secretary of the Army to prevent obstruction to navigation in the navigable waters of the United States is extended to artificial islands and fixed structures located on the outer Continental Shelf."

31. In the complaint emphasis was placed on the fact that at the time of the collision S/S Kimon was bound on an intrastate voyage from New Orleans to Lake Charles, Louisiana to discharge part of her cargo. Since as a foreign flag vessel she could not carry domestic coastwise cargo, 46 U.S.C.A. §§ 883, 251, 319, this circumstance is purely coincidental and there is no more Louisiana interest at stake here than had she hit the platform while bound to Houston, her subsequent port of call, or hit it returning across the Gulf on her homeward voyage.

32. The Direct Action Statute does not, of course, confer jurisdiction over the owners or operators. But as with the fiction of *in rem* liability, *cf.* Continental Grain Co. v. Federal Barge Lines, Inc., 1961, 364 U.S. 19, 80 S.Ct. 1470, 4 L.Ed.2d 1540, aff'g, 5 Cir., 1959, 268 F. 2d 240, 1959 A.M.C. 2158, it is very likely that—although increased insurance cost is not a factor in a direct action limitation situation, see Olympic Towing Corp. v. Nebel Towing Co., supra,—the *sophisticated world of retrospective rating plans and experience-adjusted premium costs the owner bears a considerable amount of a loss when the underwriter is cast.

33. Louisiana, as do many states, has extremely broad statutes purporting to subject foreign insurance companies to in personam jurisdiction by substituted service, etc. On the issue not reached by us (see note 12, *supra*) presumably the Trial Judge found amenability based on the underwriter's activities for others than the owner of S/S Kimon.

**1040**

Louisiana Federal Court even though the vessel never had been and never would trade to and from Louisiana ports. If that is so, then it would be equally unthinking to suppose that Congress meant to import an exception by allowing adoption where, by a further rare coincidence, the foreign vessel, otherwise free to sail as she pleases, happens to hit the structure while bound to or from a Louisiana port. Any such "exception" would itself disrupt the basic underlying policy of non-interference with navigation on the high seas by making it necessary for underwriter or owner, or both, to first submit to the Louisiana Direct Action suit and then in it establish the right to the "exception."

These considerations become more significant in the light of today's multi-party donnybrooks, see Grigsby v. Coastal Marine Service, 5 Cir., 1969, 412 F.2d 1011, A.M.C. in which theories of initial, contingent and secondary liabilities orbit to an imaginative apocenter. Without physically touching the off shore structure to trigger the Extension of Admiralty Act, (note 9, *supra*) it is quite conceivable that the conduct of the foreign vessel might be found to have brought about damage to the structure caused physically by some other craft under circumstances in which the law would conclude that in legal effect it was the foreign vessel that "hit" the structure. Thus by a series of fictions and legal theories a foreign underwriter or owner, or both, find the freedom of the seas disrupted by a statute of a state not then visible and to which neither ever intended to go.

In this approach both "applicable" and the "not inconsistent" elements are interpreted together. The term "applicable" gets much of its meaning from factors bearing on "not inconsistent." Whether for off shore, unlike inland, maritime cases we would hold the Direct Action Statute inconsistent we need not here determine. Taking into account the National and International interests behind

that element we do hold that for this maritime case the Direct Action Statute is not applicable.

Affirmed.