## RODRIGUE ET AL. v. AETNA CASUALTY & SURETY CO. ET AL.

No. 436.   Argued February 25, 1969.—Decided June 9, 1969.

*Philip E. Henderson* argued the cause for petitioners. With him on the briefs were *A. Deutsche O'Neal* and *George Arceneaux, Jr.*

*James E. Diaz* argued the cause for respondents. With him on the brief were *W. Ford Reese, Richard C. Baldwin,* and *James E. Blazek.*

MR. JUSTICE WHITE delivered the opinion of the Court.

This case involves two men, Dore and Rodrigue, who met their deaths on artificial island drilling rigs located on the outer Continental Shelf off the Louisiana coast.

Each man's family brought suit for wrongful death in the federal courts both under the Death on the High Seas Act, 41 Stat. 537, 46 U. S. C. § 761 *et seq.* (hereinafter "Seas Act"), and under Louisiana law assertedly made applicable by the Outer Continental Shelf Lands Act, 67 Stat. 462, 43 U. S. C. § 1331 *et seq.* (hereinafter "Lands Act"). Each family's suit was separately heard and decided in the District Courts and in the Court of Appeals below. In both cases the Court of Appeals for the Fifth Circuit, affirming the District Courts, held that the Seas Act was the exclusive remedy for these deaths. Petitioners sought certiorari, claiming that they are entitled to an additional remedy under the state law adopted by the Lands Act.

In the *Dore* case, the decedent was working on a crane mounted on the artificial island and being used to unload a barge. As the crane lifted a load from the barge to place it on the artificial island, the crane collapsed and toppled over onto the barge, killing the worker. His widow and her three children brought a single action in the United States District Court for the Western District of Louisiana, alleging their own and the decedent's residency in Louisiana and the negligence of the firms which manufactured, installed, and serviced the crane. The suit was brought under the "General Maritime Laws, the Death on the High Seas Act, . . . Article 2315 of the [Louisiana Code] and under the other laws of the United States and the State of Louisiana." It claimed $670,000 in damages to the family plaintiffs for loss of their husband and father, including pecuniary and psychic losses. On motion for summary judgment as to all claims but that under the Seas Act, the District Judge determined that the latter was plaintiffs' only remedy, removed the case to the admiralty side of the court, and thus limited the plaintiffs' recovery to pecuniary loss. The state statute would have allowed recov-

ery for additional elements of damage. The District Judge certified the question pursuant to Federal Rule of Civil Procedure 54 (b), and the Court of Appeals for the Fifth Circuit affirmed. 391 F. 2d 671.

In the *Rodrigue* case, the decedent was performing a test on a drill pipe. He was high on the derrick rising above the artificial island, and fell from it to his death on the floor of the structure. His widow and two children brought three actions in the District Court for the Eastern District of Louisiana. One was an admiralty action under the Seas Act; the other two were civil actions respectively against the owner and insurer of the drill rig, and the owner of the stationary platform. The civil actions were brought under the Lands Act and Article 2315 of the Louisiana Revised Civil Code. The trial court consolidated the two civil actions and dismissed the insurer, who had been made a party to one of the civil actions pursuant to the Louisiana direct-action statute, La. Rev. Stat. Ann. § 22:655. No reason was assigned for the dismissal, but the ground urged in the motion was that the accident did not occur within the State of Louisiana, so that Louisiana law did not apply. Consistently with this, the District Judge dismissed the consolidated civil action before trial, on the ground that the Seas Act provided a remedy and that under such circumstances the Lands Act would not make the inconsistent state remedy applicable.[1] The admi-

---

[1] The District Court dismissed one of the civil causes of action on the ground that unlike the other it did not specifically name the Lands Act, but rested instead directly on Louisiana law. This formal omission was inconsequential because of the District Judge's view that there would be no cause of action even under the Lands Act and Louisiana law together. On remand, it may be that both claims can be construed to assert actions under the Lands Act and Louisiana Law, or that any deficiency in this regard can be cured by amendment of the pleadings. Fed. Rule Civ. Proc. 15.

ralty action proceeded to trial and judgment of $75,000, 266 F. Supp. 1, which is not now before us. On appeal of the dismissal of the civil actions, the Court of Appeals for the Fifth Circuit affirmed the District Court *per curiam,* citing its decision in the *Dore* case almost two months before. 395 F. 2d 216.

Certiorari was granted in both cases, 393 U. S. 932 (1968), and they were argued together here. In light of the principles of traditional admiralty law, the Seas Act, and the Lands Act, we hold that petitioners' remedy is under the Lands Act and Louisiana law. The Lands Act makes it clear that federal law, supplemented by state law of the adjacent State, is to be applied to these artificial islands as though they were federal enclaves in an upland State. This approach was deliberately taken in lieu of treating the structures as vessels, to which admiralty law supplemented by the law of the jurisdiction of the vessel's owner would apply. *The Hamilton,* 207 U. S. 398 (1907). This was done in part because men working on these islands are closely tied to the adjacent State, to which they often commute and on which their families live, unlike transitory seamen to whom a more generalized admiralty law is appropriate. Since the Seas Act does not apply of its own force under admiralty principles, and since the Lands Act deliberately eschewed the application of admiralty principles to these novel structures, Louisiana law is not ousted by the Seas Act, and under the Lands Act it is made applicable.

## I.

The purpose of the Lands Act was to define a body of law applicable to the seabed, the subsoil, and the fixed structures such as those in question here on the outer Continental Shelf. That this law was to be federal law of the United States, applying state law only as federal law and then only when not inconsistent

with applicable federal law, is made clear by the language
of the Act. Section 3 makes it the "policy of the United
States" that the affected areas "appertain to the United
States and are subject to its jurisdiction, control, and
power of disposition." [2]   Section 4 [3] makes the "Constitu-

---

[2] 67 Stat. 462, as set forth in 43 U. S. C. § 1332:

"(a) It is declared to be the policy of the United States that
the subsoil and seabed of the outer Continental Shelf appertain to
the United States and are subject to its jurisdiction, control, and
power of disposition as provided in this subchapter."

[3] 67 Stat. 462, as set forth in 43 U. S. C. § 1333:

"§ 1333. Laws and regulations governing lands.

"(a) Constitution and United States laws; laws of adjacent States;
publication of projected State lines; restriction on State taxation
and jurisdiction.

"(1) The Constitution and laws and civil and political jurisdiction
of the United States are extended to the subsoil and seabed of the
outer Continental Shelf and to all artificial islands and fixed struc-
tures which may be erected thereon for the purpose of exploring
for, developing, removing, and transporting resources therefrom, to
the same extent as if the outer Continental Shelf were an area of
exclusive Federal jurisdiction located within a State: *Provided, how-
ever,* That mineral leases on the outer Continental Shelf shall be
maintained or issued only under the provisions of this subchapter.

"(2) To the extent that they are applicable and not inconsistent
with this subchapter or with other Federal laws and regulations
of the Secretary now in effect or hereafter adopted, the civil and
criminal laws of each adjacent State as of the effective date of this
subchapter are declared to be the law of the United States for that
portion of the subsoil and seabed of the outer Continental Shelf,
and artificial islands and fixed structures erected thereon, which
would be within the area of the State if its boundaries were extended
seaward to the outer margin of the outer Continental Shelf, and the
President shall determine and publish in the Federal Register such
projected lines extending seaward and defining each such area. All
of such applicable laws shall be administered and enforced by the
appropriate officers and courts of the United States. State taxation
laws shall not apply to the outer Continental Shelf.

"(3) The provisions of this section for adoption of State law as
the law of the United States shall never be interpreted as a basis

tion and laws and civil and political jurisdiction of the United States" apply "to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State." Since federal law, because of its limited function in a federal system, might be inadequate to cope with the full range of potential legal problems, the Act supplemented gaps in the federal law with state law through the "adoption of State law as the law of the United States." Under § 4, the adjacent State's laws were made "the law of the United States for [the relevant subsoil and seabed] and artificial islands and fixed structures erected thereon," but only to "the extent that they are applicable and not inconsistent with . . . other Federal laws."

It is evident from this that federal law is "exclusive" in its regulation of this area, and that state law is adopted only as surrogate federal law. The Senate Report on the bill referred to the "precise unequivocal language" of "the provision for the adoption of State laws as Federal law," and referred to the applicable body of law as consisting of the Constitution and laws of the United States, the regulations of the Secretary of the Interior, and finally the laws of the adjacent States "adopted as Federal law and made applicable to supplement existing Federal law and regulations." S. Rep. No. 411 of the Committee on Interior and Insular Affairs, 83d Cong., 1st Sess., 11 (1953).

It was the Senate Committee which first introduced the present provision adopting state law, and in its report explaining the introduction it asserted: "Paragraph (2) adopts State law as Federal law, to be used when Fed-

---

for claiming any interest in or jurisdiction on behalf of any State for any purpose over the seabed and subsoil of the outer Continental Shelf, or the property and natural resources thereof or the revenues therefrom."

eral statutes or regulations of the Secretary of the Interior are inapplicable." *Id.*, at 23. This language makes it clear that state law could be used to fill federal voids. And in the conference report, the House managers of the bill noted that laws of adjacent States which are not inconsistent with federal law "are adopted as the laws of the United States for those particular areas." H. R. Conf. Rep. No. 1031, 83d Cong., 1st Sess., 12 (1953).

The principles that federal law should prevail, and that state law should be applied only as federal law and then only when no inconsistent federal law applied, were adopted by a Congress in which full debate had underscored the issue. Senator Cordon, in presenting the Lands Act to the Senate, noted that the problem addressed by the committee had been raised by "the fact that the full development of the estimated values in the shelf area will require the efforts and the physical presence of thousands of workers on fixed structures in the shelf area. Industrial accidents, accidental death, peace, and order" present problems requiring a body of law for their solution. Since "as every Member of the Senate knows, the Federal Code was never designed to be a complete body of law in and of itself," the committee decided that state law would have to be referred to in some instances. 99 Cong. Rec. 6962–6963. As Senator Anderson, a member of the conference committee, put it: "The real point is . . . that the language in section 4 provides that Federal laws and regulations shall be applicable in the area, but that where there is a void, the State law may be applicable . . . ." 99 Cong. Rec. 7164. Senator Cordon noted that this view was "entirely correct" and added that: "These laws, by the terms of the act, are enacted as Federal law."

The opponents of the Act realized full well that state law was being used only to supplement federal law, and

Senator Long introduced an amendment to the Act which would have made "the laws of such State applicable to the newly acquired area, and . . . the officials of such State [the agents empowered] to enforce the laws of the State in the newly acquired area." In arguing for his amendment, Senator Long asserted that "[i]t is even more important that State law should apply on the artificial islands than on natural islands . . . ." But the amendment was rejected. See 99 Cong. Rec. 7232–7236. This legislative history buttresses the Court of Appeals' finding that in view of the inconsistencies between the state law and the Seas Act, the Seas Act remedy would be exclusive if it applied.

## II.

However, for federal law to oust adopted state law federal law must first apply. The court below assumed that the Seas Act[4] did apply, since the island was located more than a marine league off the Louisiana coast. But that is not enough to make the Seas Act applicable.[5] The Act redresses only those deaths stemming from wrongful actions or omissions "occurring on the high seas," and these cases involve a series of events on artificial islands. Moreover, the islands were not erected primarily as navigational aids, and the

---

[4] 41 Stat. 537, 46 U. S. C. §§ 761–768. 46 U. S. C. § 761 reads:

"Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued."

[5] Since this topic received scant attention in argument in this Court, additional briefs were requested.

accidents here bore no relation to any such function. Admiralty jurisdiction has not been construed to extend to accidents on piers, jetties, bridges, or even ramps or railways running into the sea.[6]  To the extent that it has been applied to fixed structures completely surrounded by water, this has usually involved collision with a ship and has been explained by the use of the structure solely or principally as a navigational aid.[7]  But when the damage is caused by a vessel admittedly in admiralty jurisdiction, the Admiralty Extension Act[8] would now make available the admiralty remedy in any event.

The accidents in question here involved no collision with a vessel, and the structures were not navigational aids.  They were islands, albeit artificial ones, and the accidents had no more connection with the ordinary stuff of admiralty than do accidents on piers.  Indeed, the Court has specifically held that drilling platforms are not within admiralty jurisdiction.  *Phoenix Construction Co.* v. *The Steamer Poughkeepsie,* 212 U. S. 558, affirming 162 F. 494 (1908).  There a ship damaged a structure "composed of various lengths of wrought iron pipe surrounded by a platform on the surface."  Citing the same cases on which the lower court had relied, this Court affirmed its conclusion that jurisdiction was lacking since the "project which the libellant was engaged

---

[6] *The Plymouth,* 3 Wall. 20 (1866); *The Troy,* 208 U. S. 321 (1908); *T. Smith & Son, Inc.* v. *Taylor,* 276 U. S. 179 (1928); *Hastings* v. *Mann,* 340 F. 2d 910 (C. A. 4th Cir.), cert. denied, 380 U. S. 963 (1965).

[7] *The Blackheath,* 195 U. S. 361 (1904); *The Raithmoor,* 241 U. S. 166 (1916); *Doullut & Williams Co.* v. *United States,* 268 U. S. 33 (1925).

[8] "The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land." 62 Stat. 496, 46 U. S. C. § 740.

in is not even suggestive of maritime affairs. It was supplying water to a city and the mere fact of the means being carried under the bed of a river, with extensions through the river to the surface, did not create any maritime right, nor was it in any sense an aid to navigation, which was the distinguishing feature of The Blackheath." 162 F., at 496. In these circumstances, the Seas Act—which provides an action in admiralty— clearly would not apply under conventional admiralty principles and, since the Lands Act provides an alternative federal remedy through adopted state law, there is no reason to assume that Congress intended to extend those principles to create an admiralty remedy here. And if the Congress had made the 1920 Seas Act applicable, ousting inconsistent state law, the artificial island worker would be entitled to far less comprehensive remedies in many cases than he is now.

Even if the admiralty law would have applied to the deaths occurring in these cases under traditional principles, the legislative history shows that Congress did not intend that result. First, Congress assumed that the admiralty law would not apply unless Congress made it apply, and then Congress decided not to make it apply. The legislative history of the Lands Act makes it clear that these structures were to be treated as islands or as federal enclaves within a landlocked State, not as vessels.

In introducing the bill to the Senate, Senator Cordon explained its inception as follows:

"The committee first attempted to provide housekeeping law for the outer shelf by applying to the structures necessary for the removal of the minerals in the area under the maritime law of the United States. This was first attempted by incorporating by reference the admiralty statutes. This solution at first seemed to be a reasonably complete answer . . . inasmuch as the drilling platforms would

have been treated as vessels. Maritime law, which applies to American vessels, would have applied under that theory to the structures themselves.

"However, further consideration clearly showed that this approach was not an adequate and complete answer to the problem. The so-called social laws necessary for protection of the workers and their families would not apply. I refer to such things as unemployment laws, industrial-accident laws, fair-labor-standard laws, and so forth. . . .

.          .          .          .          .

"[Ultimately, instead,] the whole body of Federal law [was made applicable] to the area [as well as state law where necessary]. Thus, the legal situation is comparable to that in the areas owned by the Federal Government under the exclusive jurisdiction of the Federal Government and lying within the boundaries of a State in the uplands." 99 Cong. Rec. 6963.

Similarly, Senator Ellender asserted that in the first draft it "was sought to treat the platforms or artificial islands created in the water as ships" but now the "islands are made subject to our domestic law" instead so as to be "treated just as though they were islands created by nature, insofar as the application of our domestic laws is concerned." 99 Cong. Rec. 7235.

The House bill, H. R. 5134, had made federal law applicable, but also provided that the not "inconsistent . . . laws of each coastal State which so provides shall be applicable," at least if adopted by the Secretary of the Interior. H. R. Rep. No. 413, 83d Cong., 1st Sess., 4, 8–9 (1953). The Senate bill, as it read before committee amendments, provided instead that acts "on any structure (other than a vessel)" located on the Continental Shelf for exploring or exploiting its resources "shall be

deemed to have occurred or been committed aboard a vessel of the United States on the high seas and shall be adjudicated . . . according to the laws relating to such acts . . . on vessels of the United States on the high seas." When the Senate bill was reported from committee, this section had been replaced by the present language, omitting entirely any reference to treating the islands as though they were vessels.

Careful scrutiny of the hearings which were the basis for eliminating from the Lands Act the treatment of artificial islands as vessels convinces us that the motivation for this change, together with the adoption of state law as surrogate federal law, was the view that maritime law was inapposite to these fixed structures. See generally Hearings before the Senate Committee on Interior and Insular Affairs, 83d Cong., 1st Sess., on S. 1901 (1953) (hereafter Hearings). One theme running throughout the hearings was the close relationship between the workers on the islands and the adjoining States. Objections were repeatedly voiced to application of maritime law and with it the admiralty principle that the law of the State of the owner of the artificial island "vessel" is used for supplementation.[9] On the other

---

[9] For example, Senator Daniel asserted that "the fixed platforms out there do not even touch the waters except for the supporting pipes or 'legs' which go through the water down into the ground. I think you can treat those platforms as connected with the soil and development of the soil rather than treating them as vessels." Hearings 22. Similarly, Acting Secretary of the Treasury Rose opined in a letter to the Committee that these islands might not even be considered to be "upon navigable waters" for the purpose of applying laws requiring safety lights. Hearings 53. A specific provision was added to the statute to permit safety regulation. § 4 (e), 43 U. S. C. § 1333 (e). Obviously these islands were not constructed principally as aids to navigation as respondents contend, cf. *Pure Oil Co.* v. *Snipes,* 293 F. 2d 60 (C. A. 5th Cir. 1961), but were instead hazards to navigation requiring warning

hand, federal enforcement of the law in this area was insisted upon by the Department of Justice, and there was substantial doubt whether state law and jurisdiction could or should be extended to the structures.[10]   A federal solution was thought necessary.

The committee was aware that it had the power to treat activity on these artificial islands as though it occurred aboard ship.  *Jones* v. *United States,* 137 U. S. 202 (1890); Hearings 511–512; Extension of Admiralty Act of 1948, 62 Stat. 496, 46 U. S. C. § 740; see *United States* v. *Matson Nav. Co.,* 201 F. 2d 610 (C. A. 9th Cir. 1953); cf. *Gutierrez* v. *Waterman S. S. Corp.,* 373 U. S. 206, 209 (1963).   And the very decision to do so in the initial bill recognized that if it were not adopted explicitly, maritime law simply would not apply to these stationary structures not erected as navigational aids.[11]   Moreover, the committee was acutely aware of the inaptness of admiralty law.   The bill applied the same law to the

---

facilities.  Governor Kennon of Louisiana voiced strong opposition, Hearings 449–485, as did Senator Long of that State, *e. g.,* Hearings 275–278.  See also Hearings 513–518, 545, 612.  And at Hearings 644–645, the inappropriateness of applying the law of the owner of the artificial island or subsoil lease, rather than the law of the adjacent State, was given special emphasis.

[10] See letter to Senator Cordon from Assistant Attorney General Rankin, Hearings 700; testimony of Mr. Rankin, Hearings 644–645, 664–665, 652–653.

[11] In the opening discussion of the original draft of the bill, treating these islands as vessels, Senator Cordon remarked: "It is the view of the chairman that when these individuals leave their vessels and board this structure, they are subject to the law that operates on the structure, which in this instance is the same law that operates on board a ship, but becomes that *only because of this act.*"  Hearings 9. (Emphasis added.)  And at the end of the hearings, when the Senators were questioning an admiralty lawyer on the treatment these structures would receive absent any statutory provision, he informed them that even a lighthouse would be treated as land, except insofar as it was subject to admiralty jurisdiction as an aid to navigation.  Hearings 669–670.

seabed and subsoil as well as to the artificial islands, and admiralty law was obviously unsuited to that task.[12]

Although the Assistant Attorney General, Office of Legal Counsel, persisted to the end in his claim that admiralty law should apply, and that with it should be incorporated the law of the State of the island's owner, this view obviously did not prevail. Instead, a compromise emerged. The administration's opposition to committing these areas solely to the jurisdiction of state courts, state substantive law, and state law enforcement was recognized in that the applicable law was made federal law enforceable by federal officials in federal courts. But the special relationship between the men working on these artificial islands and the adjacent shore to which they commute to visit their families was also recognized by dropping the treatment of these structures as "vessels" and instead, over the objections of the administration that these islands were not really located within a State, the bill was amended to treat them "as if [they] were [in] an area of exclusive Federal jurisdiction located within a State." State law became federal law federally enforced.

In view of all this, and the disclosure by Senator Cordon to the Senate upon introduction of the bill that the admiralty or maritime approach of the original bill had been abandoned, it is apparent that the Congress decided that these artificial islands, though surrounded by the

---

[12] An admiralty expert questioned by the committee took the position that application of maritime law would be unwise. "Maritime law in the strict sense has never had to deal with the resources in the ground beneath the sea, and its whole tenor is ill adapted for that purpose." Hearings 668. Since the Act treats seabed, subsoil, and artificial islands the same, dropping any reference to special treatment for presumptive vessels, the most sensible interpretation of Congress' reaction to this testimony is that admiralty treatment was eschewed altogether, except to the extent that the Extension of Admiralty Act might make it applicable.

high seas, were not themselves to be considered within maritime jurisdiction. Thus the admiralty action under the Seas Act no more applies to these accidents actually occurring on the islands than it would to accidents occurring in an upland federal enclave or on a natural island to which admiralty jurisdiction had not been specifically extended. At a minimum, the legislative history shows that accidents on these structures, which under maritime principles would be no more under maritime jurisdiction than accidents on a wharf located above navigable waters, were not changed in character by the Lands Act.

Since the inapplicability of the Seas Act removes any obstacle to the application of state law by incorporation as federal law through the Lands Act, the decisions below are reversed and the causes remanded for proceedings consistent with this opinion.

*It is so ordered.*