Charles STARK, Plaintiff,

v.

SHELL OIL COMPANY, Defendant,

v.

HIGHLANDS INSURANCE COMPANY, Intervenor.

No. WC 6831-S.

United States District Court,
N. D. Mississippi, W. D.

May 8, 1970.

---

John P. Fox, Houston, Miss., L. G. Fant, Jr., of Fant & Crutcher, Holly Springs, Miss., for plaintiff.

H. H. Whitworth, of Watkins & Eager, Jackson, Miss., for defendant.

George F. Woodliff, of Heidelberg, Woodliff & Franks, Jackson, Miss., for intervenor.

OPINION

ORMA R. SMITH, District Judge.

This case has been tried to the Court without a jury and is submitted for decision on the record, the evidence received at the hearing, including the depositions introduced, and briefs of counsel.

The Court, after having given due consideration to all issues involved, adopts the findings of fact and conclusions of law which follow:

## FINDINGS OF FACT

Plaintiff Charles E. Stark on August 28, 1967, an employee of Otis Engineering Corporation, was assigned by his employer to perform the duties of a wireline operator on the top deck of an offshore production oil platform of defendant Shell Oil Company, situated off the Louisiana Coast in the Gulf of Mexico. While engaged in the work to which he was assigned plaintiff was injured when struck in the back by a pipe which was being moved from the top to the lower deck of the offshore platform by defendant, by the use of a crane.

The platform was the property of defendant and a production operation was being conducted there. The platform has two decks, referred to herein as the "top deck" and the "lower deck." The lower deck is 210 feet long, running north and south, and 110 feet wide, running east and west. The top deck is elevated above the center of the lower deck and is 70 feet wide, east and west, and 50 feet long, north and south. Thus, the lower deck extends some distance north and south and a shorter distance east and west from the outside edges of the top deck.

The crane involved in the case is a thirty-ton crane, with an 80' boom and a large steel cable to which is attached a hook which is used to pick up a cradle or saddle holding objects being moved, in this case, steel pipe. The crane was situated on the west edge of the top deck and the pipe involved, which was being moved from the top deck to the north side of the lower deck, was lying in a pile on the west side of the top deck north of the crane. Before the pipe was picked up by the crane, its boom extended northward.

The crane is so arranged that a seat is provided for the operator, and it is from this point that the crane is placed in operation. The operator commands a full and unobstructed view over the entire floor of the top deck and most of the lower deck outside the portion situated under the top deck.

Within easy reaching distance of the operator's seat is located a button or switch to be used in blowing the horn on the crane. The horn gives notice to all persons situated near the crane that the crane is being or is about to be placed in operation.

The operator is assisted in the operation of the crane by a swamper, who arranges for the loading of the cradle or saddle, which he attaches to a hook on the cable. The swamper works under the orders of the crane operator, and when instructed so to do the swamper will give warning to those on the top deck who appear to be in the line of travel of the crane.

At the time of the occurrence involved herein, plaintiff was working with his helper in approximately the center of the top deck, or about 35 feet from the west and east sides and 25 feet from the north and south sides thereof. He was bending over slightly, though with his head erect, pouring solvent from a barrel. His helper was several feet away.

As plaintiff was performing this task, the crane operator initiated the movement whereby several lengths of steel pipe on the top deck would be transferred to a point on the north side of the lower deck.

The pipe was to be picked up 25 or 30 feet north of the base of the crane and moved directly north to the lower deck. The best course to pursue in accomplishing this movement was to pick up the pipe and move it directly north to the lower deck. By such a movement, plaintiff would not have been in or near the

movement of the pipe. There was nothing to prevent the crane operator from following this course. Instead of selecting this course the operator carried the pipe in a circular or swinging manner so as to swing the load out over the deck where plaintiff was engaged in his work. Having full view of the scene, the operator did not cause the horn to be blown and did not instruct the swamper to give notice to those working on the top deck, including the plaintiff, of the approach of the pipe as it swung out over the deck, and such warning was not given. As the pipe swung around and over the deck it struck plaintiff in the back and on the back of the head, knocking him down to the floor of the deck.

Plaintiff knew of the existence of the crane and that it would be engaged in moving the pipe from the top to the lower deck, but he relied upon defendant to give warning of any movement of pipe that would move close enough so as to endanger him. At the time the pipe struck him, plaintiff was not facing the crane and did not observe its movement.

The work which plaintiff was performing was done under the direction of defendant, and required plaintiff to work with the wells on the platform. The work necessarily demanded his undivided attention. It was not feasible for plaintiff to keep a constant lookout for the crane and properly perform his work. It is reasonable to determine that notice of some kind should have been given to plaintiff when the crane commenced its operation and movement, in such manner as to bring plaintiff within its path.

The accident occurred early in the morning on the date above indicated. Plaintiff continued to work for several hours, before going ashore to his home. Plaintiff's back was bruised and injured and he began to suffer pain in his back and right knee.

On the third day after his injury, plaintiff went to the company doctor at Harvey, Louisiana, Dr. Vincent V. Tumminello. After examining plaintiff Dr. Tumminello prescribed muscle relaxant drugs and heat treatments for him.

Plaintiff was treated on three other occasions by Dr. Tumminello, when he had the same complaints as on the initial visit and the treatment originally prescribed was continued. On one visit a small lumbar corset was prescribed. Dr. Tumminello saw plaintiff the last time on September 11, 1967, at which time he referred him to Dr. Russell Grunsten, an orthopedic surgeon in New Orleans, Louisiana, for examination and treatment. Dr. Tumminello expressed the opinion that plaintiff was able to return to his usual work within seven to ten days of his injury, and that he had not suffered any permanent disability from the injury.

Plaintiff was examined by Dr. Grunsten on September 15, 1967. Dr. Grunsten also reviewed the x-rays taken of plaintiff's lumbar spine by Dr. Tumminello. Dr. Grunsten expressed the opinion that plaintiff had suffered a direct contusion type of injury to the low back from the accident, but could not find objective evidence of nerve root irritation or mechanical interference in the mobility of the back area. Dr. Grunsten thought that plaintiff could well return to his normal working activity.

Plaintiff returned to work on September 3, 1967, and worked until September 6, 1967, since which time he has not performed any duties connected with his previous employment, and has not otherwise followed a gainful occupation.

During the period January 1, 1967 through September 6, 1967, plaintiff earned the sum of $6,493.60, or approximately $166.00 per week. At this rate his yearly earning capacity would be approximately $8,000.00, taking into consideration time off periods during the year.

After his visit to Dr. Grunsten, plaintiff returned to his home near Houston, Mississippi, and became the patient of Dr. Roy Harmon, Jr., at Houston. Plaintiff was hospitalized at the Houston Hospital from September 19, 1967 until October 2, 1967, during which time he was given a myelogram, physical therapy,

heat treatments and fitted with a back brace. Plaintiff was readmitted to the Houston Hospital on October 4, 1967, where he was confined until October 31, 1967. During the latter period in the hospital, a second myelogram was taken, the first having been ineffective.

Dr. Harmon consulted with Dr. B. G. Spell, an orthopedic surgeon of Jackson, Mississippi, who happened to be in the Houston Hospital, with reference to plaintiff's case, and plaintiff later went to Jackson for an examination by Dr. Spell. This surgeon did not testify in the case, in person or by deposition.

While in the hospital at Houston plaintiff contacted Dr. A. Albert Azardegan, an orthopedic surgeon of Jackson, Mississippi, who happened to be in Houston with other patients. Plaintiff later went to Jackson for examination and treatment by Dr. Azardegan. This surgeon did not testify in person or by deposition, but his statement for services rendered is in evidence and shows numerous visits by plaintiff to his clinic from November 4, 1967 until March 17, 1969.

Dr. Harmon did not see plaintiff after November 1967, at which time he was walking in a stooped position and complaining of pain in his low back and left hip, until April 4, 1969. Dr. Harmon continued to see plaintiff at intervals until just before the trial of the case. Dr. Harmon had the opinion that when he last saw plaintiff he was totally disabled, but would not express an opinion as to whether the disability was permanent.

On November 18, 1968, plaintiff was seen by Dr. Richard L. DeSaussure, Jr., a neurosurgeon in Memphis, Tennessee, who felt that he had a ruptured disc and recommended surgery. Dr. DeSaussure was of the opinion that there was a probability that plaintiff had a ruptured disc at the L4, L5, S1 level. At that time DeSaussure was of the opinion that from a neurological standpoint plaintiff was not able to perform the duties of his regular occupation. It must be noted, however, after Dr. DeSaussure performed the operation, the details of which follow, he changed his mind in regard to plaintiff's disability.

Plaintiff would not follow Dr. DeSaussure's recommendation at that time, but returned in March 1969, and submitted to the operation. Plaintiff was confined to the hospital from March 21, 1969 until March 30, 1969. Dr. DeSaussure performed a partial hemilaminectomy looking at the disc between L4 and L5 and also the disc between L5 and S1. Dr. DeSaussure did not find a ruptured disc, and found nothing that would support plaintiff's complaints. A period of six to eight weeks of disability was forecast by Dr. DeSaussure. Plaintiff returned to the clinic, when he was seen by an associate of Dr. DeSaussure, and it was not until May 5, 1969 that Dr. DeSaussure had the occasion to see plaintiff. Since plaintiff had the same complaints as before and Dr. DeSaussure could not account for them, he recommended that plaintiff see an orthopedic surgeon. Dr. DeSaussure was of the opinion, from a neurological viewpoint, that plaintiff should be able to perform the duties required of him in his former work within eight weeks or two months from the time of his operation.

Plaintiff sought the services of Dr. J. Elmer Nix, of Jackson, Mississippi, an orthopedic surgeon, who examined him on July 7, 1969. The studies made by Dr. Nix did not suggest that plaintiff had Marie Strumpell, a possibility suggested by Dr. DeSaussure, but they did not rule out the possibility either. Dr. Nix recommended that plaintiff be evaluated by a specialist in internal medicine with particular emphasis on arthritic problems. Dr. Nix was of the opinion that plaintiff was not, at the time of the examination, able to do heavy work of the type usually performed by plaintiff.

After his visit to the office of Dr. Nix, plaintiff sought the assistance of a team of physicians and surgeons in Birmingham, Alabama, associated with the University Medical School.

Dr. Robert Stroud, a specialist in internal medicine with a specialization of rheumatology, examined plaintiff at the medical center on or about September 22, 1969, and kept him under observation for three or four days. The examination by Dr. Stroud, including x-rays of the spine and chest, did not show any evidence of degenerative arthritis or Marie Strumpell, or any other arthritic condition. Dr. Stroud could not find persistent nerve root compression, but, as he was not a neurosurgeon, he called Dr. G. R. Harsh in consultation. The record in Dr. Stroud's office indicated a suspicion of malingering. Dr. Stroud would not confirm this diagnosis, as he did not have plaintiff under his care a sufficient length of time to arrive at a definite conclusion.

Dr. Harsh, a neurosurgeon at the Medical Center, examined plaintiff for a neurological evaluation. Dr. Harsh was of the impression that plaintiff had some evidence of nerve root compression, which could be due to a ruptured disc, which had not been disclosed by the previous operation, or to an inflammatory reaction in the nerve roots. He recommended a myelogram but plaintiff declined to have one made. Under these conditions Dr. Harsh would not recommend surgery.

On motion of defendant, the Court appointed Dr. George D. Purvis, an orthopedic surgeon of Jackson, Mississippi, to examine plaintiff. This was done on October 10, 1969. Dr. Purvis reported his findings in writing, and the report is in evidence in the case. Dr. Purvis also testified in person on behalf of defendant. After a complete and thorough examination and evaluation of plaintiff's condition, Dr. Purvis was of the opinion that there was a probability that plaintiff was suffering from a herniated nucleus pulposus, L4 interspace left. Dr. Purvis did not feel that a myelogram was called for under the circumstances, but recommended exploratory surgery at L4 and L5 interspaces and, if necessary L3 on the left. It was obvious to Dr. Purvis that plaintiff was over reacting, but he attributed this to plaintiff's prolonged period of semi-invalidism and repeated examinations by numerous physicians. Dr. Purvis testified that, assuming his impression of plaintiff's condition was correct, and the condition was repaired, plaintiff should be able to return to his former work within six to twelve months. Dr. Purvis testified that it was his opinion that plaintiff could not perform heavy manual labor at the time he examined him, but, he did not agree that plaintiff had suffered a total permanent disability. In sum, Dr. Purvis was of the opinion that should the operation be performed, and a ruptured disc located in plaintiff's spine, the condition could be corrected, and that within six to twelve months plaintiff could return to his regular work, though he would suffer disability to the body as a whole ranging from ten to twenty per cent. However, if the exploratory surgery did not disclose a ruptured disc, plaintiff would not be disabled to any extent and should be able to return to his usual work within a short period of time.

Dr. A. F. White of Houston, Mississippi, specializing in internal medicine, began treating plaintiff November 19, 1969. At the time of the trial, plaintiff was under the care of Dr. White. Dr. White found a marked limitation in plaintiff's mobility, and a possibility of nerve root irritation at L3, L4, L5 and S1. His diagnosis was traumatic arthritis, which he thought to be directly related to the injury. Dr. White was of the opinion that plaintiff was permanently disabled to the extent that he could never return to and perform his former work; also that plaintiff would continue to suffer pain for an indefinite period, probably the remainder of his life. Dr. White did not think that surgery would correct plaintiff's condition. Dr. White detected plaintiff's arthritic condition as the results of blood analyses and not from x-ray examination.

Plaintiff and his wife testified that plaintiff suffered continuously with his back to the extent that his rest at night was impaired, and he could not enter

into the usual work or play activities about the home. Plaintiff complained of pain and testified that he was not able to perform work of any nature.

█ Drs. Spell and Azardegan, Jackson neurosurgeons, did not testify. Plaintiff testified about his visits with these doctors, but did not go into detail in regard to the examinations. In the course of taking depositions for Drs. Tumminello, Grunsten, Stroud and DeSaussure, defendant's counsel propounded to each of them certain hypothetical questions, to which plaintiff has filed objections, contending that the questions contain facts which are not in the record, and in some instances the facts to be assumed were not complete. After consideration of the objections the Court is of the opinion that they should be sustained in the particulars which follow.

a) The objection to a hypothetical question propounded to Dr. Tumminello, beginning on page 11, line 8 of the deposition of the witness and continuing through line 5 on page 13, is sustained for the reason that the question required the witness to assume facts with reference to the examination of plaintiff by Dr. Spell, which are not reflected by the record in the case.

b) The objection to a hypothetical question proposed by Dr. Grunsten, commencing on page 14 of his deposition is sustained, and the answer thereto stricken, for the reason that the question includes facts relative to the examination of plaintiff by Dr. Spell, which are not shown by the record.

c) The objection to a hypothetical question beginning on page 17 of the deposition of Dr. Grunsten is sustained and the answer thereto stricken because the question assumes as a fact that Dr. DeSaussure did not find any evidence on the x-rays or myelogram indicating a ruptured disc, but, nevertheless recommended exploratory surgery, when in fact Dr. DeSaussure testified in his deposition that he made a tentative diagnosis of a ruptured disc based on his findings and evaluation of the x-ray films.

d) The objection to a hypothetical question proposed to Dr. Harsh starting on page 14 of the deposition is sustained and the answer thereto stricken because the question contains facts concerning the examination of plaintiff by Dr. Spell, which are not shown in the record.

Except as hereinabove shown, all objections of plaintiff with regard to hypothetical questions proposed to witnesses are overruled.

The Highlands Insurance Company, intervenor, carried the compensation coverage for Otis Engineering Corporation and in consequence of this coverage paid to plaintiff disability benefits in the sum of $6,720.00, and hospital and medical benefits in the sum of $2,772.99.

It is difficult for the Court to evaluate the exact nature and extent of plaintiff's injuries and the disability which he has suffered as the result thereof.

█ Taking into consideration all of the evidence in this case, the Court is of the opinion and so finds that plaintiff has demonstrated by the preponderance of the evidence that the injury which he received on August 28, 1967 has since prevented him from performing the kind and type of work performed by him at the time of his injury. The Court, however, cannot reach a determination that the disability is permanent, or that it will continue for an appreciable period of time. It appears from the evidence that should plaintiff follow the advice and counsel of properly qualified and experienced medical practitioners specializing in injuries or diseases of the spine, plaintiff should recover within a short period of time from his injuries to the extent that any resulting disability would be negligible.

## CONCLUSIONS OF LAW

This action is a civil action between citizens of different states and the matter in controversy exceeds the sum or value of Ten Thousand Dollars ($10,000.00), exclusive of interest and costs. The

Court, therefore, has original jurisdiction of the action.[1]

■■■ The incident, upon which this action is based, occurred on an offshore oil producing platform, situated on the outer Continental Shelf in the Gulf of Mexico more than twelve miles off the coast of the United States. The adjacent state, nearest the platform, is the State of Louisiana. The substantive rights of the parties are governed by the laws of the State of Louisiana.[2] The parties are in accord with this holding, except as to the affirmative defense of contributory negligence. In Mississippi contributory negligence does not act to bar the recovery, but only to diminish the amount of recovery.[3] Contributory negligence in Louisiana acts as a complete bar to the recovery.[4] Since the Court does not find plaintiff guilty of contributory negligence there is no need to pursue this issue.

The duties of an alleged tort-feasor in Louisiana are controlled by Article 2315 of the Louisiana Civil Code, which provides:

"Every act whatever of man causes damage to another, obliges him by whose fault it happened to repair it."

The standard is aptly stated in Brown v. Liberty Mutual Insurance Co., 1958, 234 La. 860, 101 So.2d 696, page 698, as follows:

"Liability for damages under Article 2315 of the Civil Code is founded upon fault and whether or not fault exists depends upon the facts and circumstances presented in each particular case. In determining fault, a commonsense test is to be applied—that is— how would a reasonably prudent man have acted or what precautions would he have taken if faced with similar conditions and circumstances? The degree of care to be exercised must always be commensurate with the foreseeable dangers confronting the alleged wrongdoer."

■■■ In applying the standard of care as set forth above, the Court finds that defendant was guilty of negligence in the operation of the crane and that such negligence was the sole proximate cause of plaintiff's injuries. The reasonable and prudent movement of the pipe, once aloft, was to carry the pipe directly north and deposit it on the lower deck. This movement was more desirable. It was also a safe movement and would not have brought the pipe in contact with plaintiff. The crane operator elected to swing the pipe out over the top deck, in a circuitous manner, and the direct and proximate result of the movement was the collision of the pipe with plaintiff. The crane operator was negligent in electing to move the pipe in this manner.

The crane operator had an unobstructed view of the entire top deck, including the place where plaintiff was performing his work. A horn was momentarily available to the crane operator for use in giving warning of the movement of the crane. By keeping a proper lookout and exercising reasonable care the crane operator, as a reasonable and prudent person, should have ascertained that plaintiff was stationed at a place which would be in the path of the crane. Notwithstanding this, the crane operator failed to sound the horn and give plaintiff notice of the movement of the crane. In failing to keep this lookout and to sound the horn, under the circumstances in the case, the crane operator was negligent in this regard, which was a proximate contributing cause of plaintiff's injury.

1. 28 U.S.C.A. § 1332.

2. 43 U.S.C.A. § 1331 et seq.
   Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487 (1938).
   Rodrigue v. Aetna Casualty and Surety Co., 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed. 2d 360 (1969).

3. Mississippi Code 1942, Annotated, Recompiled, § 1454 (1957).

4. Missouri Pacific RR Co. v. Fusilier, 5 Cir. 1958, 256 F.2d 278, 279; Guidroz v. Travelers Insurance Co., La.App.1958, 99 So.2d 916, 919.

The crane operator was assisted by a swamper, who was available to give notice to those on the top deck who might be in the path of the crane. By the exercise of reasonable care, acting as a reasonable and prudent person, the crane operator should have observed that the crane's load would come in close proximity to plaintiff and place him in a dangerous position, and should have instructed the swamper to notify plaintiff of the approach of the crane's cargo. This duty, the crane operator failed to perform, and was guilty of negligence which proximately contributed to plaintiff's injuries.

Plaintiff was accustomed to notice of the movement of the crane, when its cargo would come in close proximity to the place where he was working. Plaintiff did not see the approach of the crane or its cargo, and had his back to the crane. However, plaintiff was entitled to be notified that the crane's movement would bring it in close proximity to the place where he was working. Under the circumstances prevailing at the time plaintiff sustained his injuries, plaintiff was not guilty of any act of negligence which proximately contributed to his injuries.

██ It is well settled that one who is injured as the result of a wrongful act of another must exercise ordinary care to seek medical or surgical treatment so as to effect a cure and minimize damages, on pain of not being allowed to recover for consequences of the injury which could have been averted by the exercise of such care. 48 A.L.R.2d 346. The prevailing rule in Louisiana is that an injured person is under a duty to seek to minimize his damages by surgical treatment where an ordinarily prudent person would subject himself to such

surgery under the circumstances.[5] The Court feels that this rule of law is applicable to the facts in the case, and has taken into consideration and given effect to the rule in assessing damages.

The Court finds that the present reasonable cash value of all compensable damages sustained by plaintiff as a direct and proximate cause of his injuries is TWENTY-SEVEN THOUSAND SEVEN HUNDRED SEVENTY-TWO DOLLARS, NINETY-NINE CENTS ($27,772.99).

The intervenor has paid compensation benefits to or for the account of plaintiff in the sum of NINE THOUSAND FOUR HUNDRED NINETY-TWO DOLLARS AND NINETY-NINE CENTS ($9,492.99), for which the intervenor is entitled to recover from the aforesaid award to plaintiff, leaving plaintiff's net recovery the sum of EIGHTEEN THOUSAND TWO HUNDRED AND EIGHTY DOLLARS ($18,280.00).

The compensation benefits have been paid plaintiff or for his account by the intervenor pursuant to the Longshoremen's and Harbor Workers' Compensation Act.[6] The Act provides in substance that in cases where the injured employee institutes suit to recover damages from a third party who may be liable therefor, the employer shall be refunded compensation benefits theretofore paid to or on the behalf of the injured employee out of any recovery obtained.[7] The Act further provides that an insurance carrier shall be subrogated to all the rights of the employer created by the Act.[8]

The Circuit Court of Appeals for the Fifth Circuit has held that a compensation insurer is entitled to recover *in full* its payments from the recovery obtained by an injured workman from a third party defendant.[9]

5. Donovan v. New Orleans Ry. and Light Co., 1913, 132 La. 239, 61 So. 216; Fossier v. D. H. Holmes Co., 19 La.App. 434, 139 So. 709 (1932); Jenkins v. American Automobile Ins. Co., 111 So.2d 837 (La.App.1959).

6. 33 U.S.C.A. § 901 et seq.

7. 33 U.S.C.A. § 933.

8. 33 U.S.C.A. § 933(i).

9. Haynes v. Rederi A/S Aladdin, 5 Cir. 1966, 362 F.2d 345, 350; Boswell v. Terrace Navigation Corporation, 5 Cir. 1967, 384 F.2d 186. See also, a Second Circuit case, International Terminal Op. Co. v. Waterman SS Co., 2 Cir.1959, 272 F.2d 15.

Counsel for plaintiff contend that the Court should charge that portion of the recovery which is payable to the intervenor, with a reasonable attorney fee for services rendered in effecting the recovery; that, after deducting the amount paid the intervenor, the balance of the recovery should be reduced by the attorney fee incurred by plaintiff; and that the remainder, representing plaintiff's net recovery, should constitute the maximum credit to which the intervenor would be entitled against any benefits paid in the future. Counsel cite to sustain this position the case of Strachan Shipping Co. v. Melvin, 5 Cir. 1964, 327 F.2d 83. In *Melvin* the contest was between attorneys for plaintiff and the employer. The amount recovered was insufficient to pay the contingent fee for plaintiff's attorney, the expenses incurred in the trial, and the employer's claim in full. The court held that the attorney and the employer held liens against the recovery and the lien of the attorney was superior to that of the employer. The facts in the case sub judice are not similar to the facts involved in *Melvin.*

The record does not reflect the fee arrangement of plaintiff's attorneys. The amount remaining, after satisfying the interest of the intervenor, leaves a net amount payable to plaintiff in the sum of EIGHTEEN THOUSAND TWO HUNDRED EIGHTY DOLLARS ($18,-280.00).

The Fifth Circuit, however, while recognizing the validity of *Melvin,* has refused to extend its force beyond its ambit.

In *Haynes,* supra, the court discussed *Melvin,* and held that it did not control the issue therein presented. In *Haynes,* as in the case sub judice, the intervenor was represented by its own counsel. The court held that the fact the intervenor employed its own attorneys to preserve its position during the litigation and that they actively asserted its rights throughout the trial and were responsible, at least in a large part, for the reimbursement obtained, distinguished the case

from *Melvin.* The court allowed the intervenor to recover the full amount due it from the proceeds of the recovery, with the exception that the court charged the intervenor's share with certain expenses incurred in the trial by attorneys for the injured workman.

*Haynes* was followed by Boswell v. Terrace Navigation Corp., 5 Cir. 1967, 384 F.2d 186, in which the court said at page 188:

"Boswell bemoans the District Court's order that the intervenor be paid 100% of its disbursements out of his recovery while the recovery awarded to him was only 50% of his actual damages. Sympathetic as we might be to his plaint, the District Court's ruling accords with Haynes v. Rederi A/S Aladdin, 5 Cir. 1966, 362 F.2d 345, 350."

It follows that in the case sub judice the intervenor is entitled to recover the full amount of its disbursement.

The question raised by counsel for plaintiff with reference to the net amount herein recovered for their client, and whether the gross amount of such net recovery, without deduction for attorney fees, should be charged with a lien in favor of the intervenor, for the payment of such future sums as may be made for the benefits under the Act, is not before the Court for adjudication.

This issue is expressly excepted from the Court's ruling in this case.

## FINAL JUDGMENT

This action came on for trial before the Court, Honorable Orma R. Smith, District Judge, presiding, and the issues having been duly tried and a decision having been duly rendered,

It is Ordered and Adjudged:

1. That the plaintiff, Charles Stark, recover of the defendant, Shell Oil Company, the sum of EIGHTEEN THOUSAND TWO HUNDRED EIGHTY & NO/100 ($18,280.00) DOLLARS, with interest at the rate of six per cent per

annum from this date until paid, and his costs of action;

2. That the intervenor, Highlands Insurance Company, recover of the defendant, Shell Oil Company, the sum of NINE THOUSAND FOUR HUNDRED NINETY TWO & 99/100 ($9,492.99) DOLLARS, with interest thereon at the rate of six per cent per annum from this date until paid, and its costs of action.