**Gerald M. HYDE, Jr.**

v.

**CHEVRON U. S. A., INC.**

**Civ. A. No. 78-740.**

United States District Court,
E. D. Louisiana.

March 30, 1981.

John D. Schoonenberg, Houma, La., for plaintiff.

Lloyd C. Melancon, McLoughlin, Barranger Provosty & Melancon, New Orleans, La., for defendant.

Johnson & McAlpine, Ronald A. Johnson, Michael L. McAlpine, New Orleans, La., for Pool Offshore Co.

ARCENEAUX, District Judge.

Trial of this matter commenced on December 11, 1980.

Considering the evidence and the law, the Court, for reasons hereinafter set forth finds that the plaintiff is entitled to judgment against Chevron U.S.A., Inc. ("Chevron") in the sum of $198,920.83. Further, Chevron cannot prevail in its third-party claim for indemnity against Pool Offshore Company ("Pool"). Finally, Employers National Insurance Company is entitled to $57,290.02, pursuant to its intervention, out of the plaintiff's award.

## I. *Findings of Fact*

1.

Plaintiff Gerald M. Hyde, Jr. was employed as a derrickman and relief driller aboard the Pool workover rig no. 2, which was attached, along with living quarters and galley, to the South Timbalier Block 189A production platform owned and operated by the defendant, Chevron, on the date of the accident, May 10, 1977.

2.

On or about May 10, 1977, the Chevron South Timbalier Block 189A structure was permanently attached to the ocean floor of the Gulf of Mexico.

3.

The Chevron platform, where the accident took place, had only a limited area upon which the Pool workover rig and associated equipment could be positioned.

4.

Chevron production equipment was installed on the platform. Due to limited space caused by the location of production equipment, vessels, tanks and manifolds, the Pool workover rig and appurtenances (the living quarters, galley and related facilities) did not have their usual allotted space.

5.

The normal construction of the Pool galley and living quarters is side by side.

6.

Due to limited space on the platform, Pool constructed the living quarters on top of the galley.

7.

Because of the location of Chevron equipment, the living quarters-galley facility was modified and an extension was welded onto the stairs leading thereto so that the staircase could reach the main deck of the living quarters.

8.

The extension consisted of cutting the staircase at the bottom where a porch had previously existed. The staircase was then welded onto the living quarters at the top, and to the main deck at the bottom. An additional step was welded to the staircase, since the physical configuration of the platform required that the staircase be lengthened in order for it to reach the main deck of the platform. The evidence is in direct conflict as to whether the handrails reached the main deck. No one who testified has a clear memory that would enable us to decide this issue.

9.

The staircase was steeper than usual.

10.

On the date of the accident, plaintiff had just arrived aboard the platform for the first day of his tour of duty. After disembarking from the helicopter, he went upstairs to the living quarters to change his clothes. After having changed, he was coming down the stairs on his way to the galley for breakfast.

11.

On the date of the accident, it was drizzling, causing the steps to be slippery. The Court finds that rain is a normal and expected hazard of this operation.

12.

When plaintiff stepped on the third-to-last step from the bottom, his foot slipped, and he began to fall. Plaintiff was falling feet first. When he reached the last step, it separated from its support on one side and caved in or pointed downward toward the deck of the platform. Plaintiff, unable to break his fall, continued to fall once the last step collapsed, and he landed onto the deck of the platform on his lower back and buttocks.

13.

Plaintiff reported the accident to his tool pusher, Leonard Cheramie. Cheramie prepared an accident report, and then ordered Melvin Galloway and Johnny Whiddon to repair the step.

14.

Galloway and Whiddon cut off the old step and re-welded a new one onto the staircase beam.

**15.**

Dr. Marmande, plaintiff's first physician, diagnosed the injury as a lumbosacral strain.

**16.**

Dr. Marmande treated plaintiff until June 20, 1977, when he discharged plaintiff back to work. Plaintiff returned to Pool Rig 2, and worked light duty for approximately three months.

**17.**

Due to plaintiff's continued back pain, he sought treatment from Dr. Chris Cenac, a Houma, Louisiana orthopedic surgeon, on September 29, 1977. Treatment continued with Drs. Cenac, Burns and Chandler. In 1979, Dr. Chandler performed a laminectomy and disc surgery.

**18.**

Plaintiff moved to Gulfport, Mississippi. On September 22, 1979, he went to Gulf Coast Community Hospital after complaining of faintness and weakness in his legs. Local physicians Risch and Buckley performed a laminectomy and spinal fusion.

**19.**

Plaintiff has since moved back to Houma, Louisiana, and is again under the care of Dr. Cenac. Dr. Cenac testified that plaintiff will not be released until 18 months post fusion, or until April of 1981. Dr. Cenac further testified that plaintiff will have a 20 to 25 percent permanent partial disability. Dr. Cenac would classify plaintiff as a class five, or unemployable for oil field or manual labor type work.

**20.**

Dr. Cenac listed plaintiff's restrictions to consist of no repetitive bending, stooping or climbing, and no lifting of weights more than 50 pounds. Dr. Cenac further testified that plaintiff can expect to experience pain for the rest of his life.

**21.**

At the time of his accident, plaintiff was earning $7.36 per hour. Plaintiff worked 12 hours per day, with time and a half after 40 hours per week. Between May 10, 1976 and May 10, 1977, plaintiff earned $16,971.55.

**22.**

By stipulation, the parties agreed that Professor Harris would testify that a ¼ inch weld on the tread end of the step would have held a force of 2400 pounds in shear. It was further agreed that Mr. Harris' testimony would have revealed that he was not aware of any outside forces exerted on the stair between its construction and the accident. Additionally, he would have made no calculation and had no opinion concerning the stress imposed on the weld when struck by the plaintiff.

## II. Conclusions of Law

**1.**

This Court has jurisdiction by virtue of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333, *et seq.*, as well as diversity of citizenship between the parties and jurisdictional amount.

**2.**

The Outer Continental Shelf Lands Act mandates that Louisiana law applies to fixed offshore structures, such as the South Timbalier Block 189A structure involved in this case. *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969).

**3.**

Louisiana Civil Code Article 2322 (1870) provides that:

> The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction.

Article 2322 imposes liability upon the owner of a building to persons injured through its "ruin", whether due to a vice in its original construction or through his neglect to repair it.

**4.**

"The owner's fault is founded upon the breach of his obligation to maintain or repair his building so as to avoid the creation of undue risk of injury to others. The owner is absolved from its strict liability neither by his ignorance of the condition of the building, nor by circumstances that the

defect could not easily be detected. He is absolved for such liability only if the thing owned by him falls, not because of its defect, but rather because of the fault of some third person or of the person injured thereby, or because the fault is caused by an irresistible cause or force not usually foreseeable. Article 3556(14), (15), (usually an act occasioned exclusively by violence of nature without the interference of or contribution by any human agency)." *Olsen v. Shell Oil Co.*, 365 So.2d 1285, 1288–1289 (La.1978).

The evidence in this case supports the conclusion that the plaintiff slipped and fell on the stairway while descending between the living quarters and the main deck. As plaintiff began his fall, his feet struck the bottom step, which gave way upon impact. It is true that the failure of the last step was not the sole cause of the damage, but the evidence supports the proposition that its failure directly, and in natural and continuous sequence, produced, or contributed substantially to produce, the damage. It can reasonably be said that, except for the failure of the last step, the injury or damage would not have occurred. It is clear that the failure of the last step operated in combination with another cause (plaintiff's initial slip) that occurred at essentially the same time and as part of the same event, and that such failure contributed substantially to producing the damage.

5.

■ The Chevron fixed drilling platform constitutes a building under Article 2322, and the stairway, once welded onto the platform, became an appurtenant structure to the building made immovable by attachment. *Olsen v. Shell Oil Co., supra; Mott v. Odeco*, 577 F.2d 273 (5th Cir. 1978).

6.

■ Chevron's inability to keep the staircase in good repair and plaintiff's injury were a direct result of a defective condition in the staircase, whether the defect was due to a defect in the original design or in the manufacture (or, as here, the modification of the staircase), or through a neglect to

repair it. This Court finds that plaintiff has proven a "ruin" by a preponderance of the evidence and, therefore, Chevron's liability to plaintiff extends to damages resulting from the defect in this appurtenance, *Champagne v. Chevron, U.S.A., Inc.*, 605 F.2d 934 (5th Cir. 1979); *Olsen v. Shell Oil Co., supra*. This is true even though Pool may remain the owner of the staircase as between Pool and Chevron. *Olsen v. Shell Oil Co., supra* at 1290.

7.

■ An owner may be exculpated from liability under Article 2322 for a premise-defect, if the victim is injured, not by reason of the defect, but instead because of the fault of some third person. *See Loescher v. Parr*, 324 So.2d 441, 445 (La.1975) and decisions cited therein. Chevron cannot find exculpation in this exception. There is no evidence that the staircase failed due to any improper handling or improper use by Pool. It is true that the staircase was modified before it was welded to the platform. But the evidence is clear that such modification was caused by the nature of this particular platform's structure as it was set up by Chevron. Chevron had the ultimate responsibility and supervision of all work that took place on the platform. The absence of any Chevron objection to the modification of the staircase imputes acquiescence by Chevron. This acquiescence coupled with the absence of any evidence of any Pool mishandling prevents Chevron from shifting the responsibility to Pool. *Olsen v. Shell Oil Co., supra*.

8.

■ Under Louisiana law, the contributory negligence of the plaintiff is not a defense to an action predicated on strict liability. Chevron will only be relieved of its liability if the plaintiff, who with full knowledge and appreciation of the danger, voluntarily exposed himself to the risks and embraces the danger. *Rodrigue v. Dixilyn Corp.*, 620 F.2d 537 (5th Cir. 1980). This

form of voluntary assumption of a known risk is not present in this case. Plaintiff did not voluntarily assume a risk of injury by proceeding down the abnormally steep staircase in the drizzling rain. The staircase was the only means of egress and ingress afforded to the Pool workmen. As previously discussed, the modification to the staircase and the abnormal construction was a result of the physical characteristics of the Chevron platform. Chevron had the ultimate responsibility to supervise and authorize the construction of the structure.

Plaintiff's use of the stairway cannot be interpreted as assuming a risk of danger, nor can his using the staircase in a drizzle, a normal job hazard, be considered an undertaking of a known risk. Therefore, consistent with the rules of law announced in *Olsen v. Shell Oil Co., supra,* and *Rodrigue v. Dixilyn Corp., supra,* Chevron will not be allowed to shift its liability to plaintiff.

### 9.

As the Court finds that Chevron is strictly liable for the defective condition of the platform and its appurtenances and that the defect was a legal cause of plaintiff's injuries, Chevron is liable for damages recoverable under Louisiana and federal law.

### 10.

Considering the evidence and law in the case, the testimony adduced from the economist, Mr. Goodman, both on direct and cross examination, and the economic conditions as relevant herein, this Court feels it fair and equitable to find plaintiff's damages to be in the amount of $198,920.83, composed of:

| | |
|---|---|
| Past Wages | $50,765.43 |
| Future Lost Wages (considering discount to present value and inflation) | $100,000.00 |
| Pain and Suffering | $25,000.00 |
| Past Medical | $23,155.40 |
| | $198,920.83 |

The Court makes no award for the value of such "fringe benefits" as future hospitalization and medical insurance premiums and meals, feeling that the evidence relative to those claims is too speculative to permit determination.

### 11.

The third party complaint of Chevron against Pool, seeking indemnity under the terms of the contract between these parties, will be denied.[1]

The terms of the indemnity agreement do not entitle Chevron to be indemnified against its own negligence. Under Louisiana law, an intention to indemnify an indemnitee against his own negligence will not be presumed in the absence of a clear and specific contractual stipulation to that effect. *Mott v. Odeco, supra; Stephens v. Chevron Oil Co.,* 517 F.2d 1123 (5th Cir. 1975); *Cole v. Chevron Chemical Co.,* 477 F.2d 361 (5th Cir. 1973).

Chevron's liability in this case rests upon a degree of fault much greater than simple negligence. It would be incongruous to limit the application of the foregoing cases to negligence-based liability claims. It would make no sense at all to require a specific agreement to indemnify one against his own negligence, and yet presume an intent to indemnify one against liability predicated upon an even greater degree of fault, strict liability.

---

1. The relevant paragraph of the workover agreement reads as follows:

(7) CONTRACTOR shall be responsible for, and shall defend, indemnify and hold OPERATOR harmless from and against, any claims for damages for loss or destruction of property of CONTRACTOR, or for injury to, impairment of health of, or death of employees of CONTRACTOR or employees of CONTRACTOR'S subcontractors that may arise from CONTRACTOR'S operations under this agreement. If CONTRACTOR obtains insurance to protect itself from loss or destruction of property, CONTRACTOR agrees that any such policy or policies of insurance shall be endorsed to provide a waiver of subrogation rights against OPERATOR. CONTRACTOR shall also be responsible for and shall defend, indemnify and hold OPERATOR harmless from and against, or any claims for damages for loss or destruction of property of third parties that may arise from CONTRACTOR'S operations under this agreement. However, OPERATOR shall have the right, at its option, to participate in the defense of any such suit without relieving CONTRACTOR of any obligation hereunder.

12.

By not successfully defending the instant suit, Chevron is not entitled to recover from Pool their costs and expenses incurred. *Hobbs v. Teledyne Movible Offshore, Inc.,* 632 F.2d 1238 (5th Cir. 1980); *Stephens v. Chevron Oil Co., supra.*

13.

The evidence introduced at trial does not support the claim that Chevron was intended as an additional, designated, intended, and/or named insured under Pool's policy with Jeremy Hew Phillips.

14.

Employers National Insurance Company is entitled to its intervention as the objections made by plaintiff are without merit. The Endorsement No. 35,[2] which provides a limited waiver of subrogation, was not in effect at the time of the accident. Since nothing contained in the endorsement can be interpreted to make it retroactive, it has no bearing on this suit.

15.

Plaintiff's further reliance upon Paragraph 7[3] of the workover agreement between Chevron and Pool is also misplaced. Paragraph 7 applies directly to the loss of property and not to personal injuries. Accordingly, Employers National Insurance Company's claim in intervention is granted.

Judgment will be entered accordingly.

---

**2.** Endorsement No. 35 reads as follows:

It is agreed that, with respect to such insurance as is afforded by the policy by reason of the designation of Texas in Item 3 of the declarations, the company waives the right of subrogation (except as noted below) it may acquire against the principal named below by reason of any payment made on account of injury, including death resulting therefrom, sustained by any employee of the insured while engaged in the following described operations; provided however that said waiver of subrogation does not apply to death, compensation, and/or medical benefits where suit has been instituted by the injured employee or his beneficiary against the principal named below, and the company will intervene in said suit for reimbursement of such payments. All operations for the Principal named below:..........

Chevron U.S.A., Inc.
P.O. Box 605
LaHabra, CA 90603

**3.** See Footnote 1.