**Mrs. Jackie EVANS, Individually and as Administratrix of the Estate of Gerald Duane Evans, Deceased**

v.

**CHEVRON OIL COMPANY and Dresser Offshore Services, Inc.**

Civ. A. No. 68–1665.

United States District Court, E. D. Louisiana.

Sept. 23, 1977.

Samuel C. Gainsburgh, Kierr & Gainsburgh, New Orleans, La., for plaintiff; Robert H. McFarland, Bay Springs, Miss., of counsel.

Johnson & McAlpine, Ronald A. Johnson, Michael L. McAlpine, New Orleans, La., for Houma Welders, Inc.

Lloyd C. Melancon, McLoughlin, Barranger, West, Provosty & Melancon, New Orleans, La., for Chevron Oil.

Christovich & Kearney, J. Walter Ward, Jr., New Orleans, La., for Dresser Offshore Services, Inc., and for third party defendant, Liberty Mut'l. Ins. Co.

Robt. M. Contois, Jr., T.A., of Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for Houma Welders, Inc., and Travelers Ins. Co.

Leach, Grossel-Rossi & Paysee, Michael A. Britt, New Orleans, La., for Travelers Ins. Co.

CASSIBRY, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came before the Court for trial on March 21, 1977. After considering the evidence and law in this case, the Court, for the reasons contained in these findings of fact and conclusions of law, holds that the plaintiff is entitled to a judgment against both Chevron Oil Company and Dresser Offshore Services, Inc., jointly and in solido, in the sum of $447,878.68.

## FINDINGS OF FACT

1.

Gerald Duane Evans, the decedent herein, was employed by Houma Welders, Inc., as a welder.

2.

In July of 1968 Dresser Offshore Services, Inc., hired Houma Welders, Inc., to perform certain welding work on a workover skid unit barge, known as the Dresser 1. The barge was to be sent to a Chevron fixed platform, known as "D Structure", so that the skid unit could be used upon the platform for Chevron.

**3.**

On July 18, 1968 Houma Welders, Inc., sent a crew of welders, among whom was Gerald Duane Evans, to Leeville, Louisiana to begin working on the barge. The employees of Houma Welders performed work on the Dresser 1 while it was docked in Leeville, as well as while it was underway to the fixed offshore platform of Chevron.

**4.**

On or about July 22, 1968, the Dresser 1 arrived at the D Structure. This Chevron platform was located at Main Pass, Block 41, on the Outer Continental Shelf more than three miles from the shore of Louisiana. The workmen, including the decedent, ate and slept in crew quarters located upon the platform.

**5.**

When the Dresser 1 arrived at the D Structure, the barge was jacked up to the level of the platform so that the skid unit could be moved from the barge to the Chevron platform.

**6.**

At this point the decedent and Lee Roe Brown, a fellow employee, ended their tour of duty for Houma Welders and went to sleep. The foreman for Houma Welders, Earl Landry, inspected D Structure with one of the Chevron employees. The purpose of this inspection was to familiarize Mr. Landry with the structure as well as to familiarize him with the work required of the Houma Welders.

**7.**

One of the areas that Mr. Landry inspected was the top deck of D Structure around the vicinity of a small building known as a microwave shack. Mr. Landry testified that at the time of this inspection there were no handrails to the rear of the microwave shack. Handrails were on the side of the microwave shack, but the handrails ended near the outside rear corner of the microwave shack. Mr. Landry stated that anyone walking toward the rear of the shack could not see the absence of the handrails until that person rounded the rear corner of the shack and was in the place where there were no rails.

**8.**

Mr. Landry testified that he had been to this same D Structure on other occasions a few months before. On these previous occasions there was a handrail in the area behind the microwave hut.

**9.**

Mr. Landry did not tell Mr. Brown or the decedent of the absence of the handrails. Both men were off duty and believed to be sleeping at the time Mr. Landry made his inspection.

**10.**

Soon after the employees of Houma Welders arrived at the platform, the work to be done by them was substantially complete, and most of the work crew were sent ashore. However, Mr. Landry was asked by employees of Chevron and Dresser to allow two of his men to stay on the structure to do some additional welding work. Mr. Brown and the decedent volunteered for this assignment.

**11.**

Mr. Landry expected the men to perform welding work on the skid units in the area in front of the microwave shack. Consequently, he did not advise them of the absence of the guardrails in the rear of the shack.

**12.**

Some time prior to midnight on July 23, 1968, Mr. Brown and the decedent began welding gussets or support components to the Dresser unit. At this time the foremost portion of the workover rig had been skidded onto the Chevron platform and was in the vicinity of the front of the microwave shack. Mr. Paul Hickey, a Chevron employee, testified that he saw the decedent and Mr. Brown working on the Chevron skid beams farther toward the edge of the platform. Nevertheless, Mr. Hickey said that this was about 12:00 midnight. Some time *after* 12:00 midnight, Mr. Chuck Baupre saw Mr. Brown and the decedent. At this time the men were near the front corner of the microwave shack on the end closest to the Dresser barge and away from the edge of D Structure.

**13.**

Mr. Brown, who was working with the decedent, testified by deposition that he and the decedent were working in front of the microwave shack. Either Mr. Hickey is mistaken, which can well be understood since the incident occurred more than nine years ago, or when he saw the men it was earlier than the time he indicated.

**14.**

Mr. Brown and the decedent continued to weld in the vicinity of the microwave shack into the early morning hours of July 24, 1968. Mr. Brown was the only person working with the decedent. Mr. Brown testified that he saw the decedent proceed to walk around the microwave shack in order to weld the gusset from the other side. The evidence indicates that the only way that the decedent could get to the area that he needed to weld was to walk around the shack.

**15.**

After seeing the decedent walk around the corner of the shack, Mr. Brown completed his work and went to the galley, which is located on another part of the structure. When Mr. Brown returned, he noticed that the decedent was not there and proceeded to look for him. After looking for the decedent on the structure, he returned to the microwave shack and proceeded to walk around the shack as he had seen the decedent doing when he last saw him.

**16.**

Mr. Brown rounded the corner of the shack and walked to the rear of it in the direction of the edge of the platform. He looked over the edge of the platform and saw the decedent's body some 40 to 60 feet below on the boat landing.

**17.**

Mr. Baupre testified that he saw the decedent and Mr. Brown working some time after 12:00 near the front part of the building. This is consistent with Mr. Brown's testimony. Mr. Baupre further stated that some time during the early morning hours of the 24th he walked again in the area in which he last saw the men working and, on this occasion, saw only Mr. Brown. Mr. Baupre said that Mr. Brown did not know the whereabouts of the decedent. This also is consistent with Mr. Brown's testimony. Mr. Brown had left the decedent after he had seen him round the corner of the microwave shack. When Brown returned, the decedent was not there. Mr. Brown continued his work before stopping to look for the decedent. It must have been at this time that Mr. Baupre saw him.

**18.**

Mr. Baupre said that when he asked Mr. Brown where the decedent was, Mr. Brown replied that the decedent must have either gone to look for welding rods or gone to sleep. The welding rods were on the front part of the structure in the area toward the Dresser barge. As stated before, the sleeping quarters for the Houma men were on the Dresser barge. This also is consistent with Mr. Brown's testimony.

**19.**

After Mr. Brown saw the decedent's body on the boat landing, he left the working area and reported the incident to Chevron and Dresser employees. Subsequently, an accident report was filed by the Dresser toolpusher. The report, made shortly after the incident had occurred, is consistent with Mr. Brown's testimony.

**20.**

The area behind the microwave shack from which Mr. Evans fell was part of the Chevron structure. The boat deck below to which the decedent fell was also part of the Chevron structure. There were no guardrails or handrails in the area behind the microwave shack. Moreover, Mr. Brown noticed grease and oil on the catwalk in this area. The absence of handrails in that area was a violation of 33 C.F.R. §§ 143.151 and 143.155 (1976). The evidence supports the conclusion that the decedent slipped from the catwalk and fell to the boat landing below and that the lack of guardrails proximately caused the decedent's fall and demise.

**21.**

The Court finds as a matter of fact that Chevron knew of the absence of handrails in the area behind the microwave shack. Mr. Landry testified that he was shown that area by a Chevron gauger who had an opportunity to observe the missing handrails.

**22.**

Furthermore, Mr. Paul Hickey, a project engineer of Chevron, testified that he knew that the handrails were missing prior to the incident. This knowledge is imputable to Chevron, and Chevron is negligent for failing to warn the workmen or to remedy the situation. The Court finds as a matter of fact that Chevron knew of the absence of handrails. Even if Chevron did not know of the absence of handrails, this would not relieve it of responsibility, as Chevron should have known it.

**23.**

Additionally, the Dresser toolpusher knew or should have known of the absence of the railing. He should have taken some steps to warn those working aboard the Chevron platform, such as the decedent, of the safety railing's absence or should have taken steps to remedy the situation. Dresser's failure to do either renders it negligent.

**24.**

The defendants in their pleadings claim contributory negligence on the part of decedent. The defendants have failed to carry their burden of proof in this regard.

**25.**

The evidence is clear that Gerald Duane Evans was unaware of the absence of handrails behind the microwave shack. The photograph (Exhibit P–5) showing the view from the front of the microwave shack indicates that the rail ended behind the microwave shack, so that one walking from the front toward the rear would not know of the absence of the handrails at the rear.

**26.**

The evidence reflects that Gerald Duane Evans and Jackie Elaine Moss Evans were married on April 1, 1965. Shortly after the marriage the decedent commenced construction work on a pipeline. Sometime in 1966 he left the pipeline work to enter welding school. After graduating from welding school, Mr. Evans began working as a welder and continued to work as a welder until he was killed.

**27.**

At the time of his fatal injury, Gerald Duane Evans was earning $52.50 per day, for a total yearly wage of $13,650. This wage is verified by his 1968 tax return, which represents the wages he earned during 1968 up to the time of his death, and by the statement of the decedent's wage supplied by his employer to the United States Department of Labor.

**28.**

The evidence supports the conclusion that the decedent would retain for his use $150 per month or $1,800 per year. This would leave $11,850 per year for Mrs. Evans and Debbie Darlene until the child reached 21 years of age. Thereafter, if the decedent had utilized three times as much on himself ($450 per month), or a total of $5,400 per year, this would leave $8,250 per year for Mrs. Evans' use until the decedent would have reached 65 years of age, his work-life expectancy.

## CONCLUSIONS OF LAW

**1.**

This Court has jurisdiction by virtue of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333, *et seq.*, as well as diversity of citizenship between the parties and jurisdictional amount.

**2.**

■ The Outer Continental Shelf Lands Act mandates that Louisiana law apply to fixed offshore structures, such as the D Structure involved in this case. *Rodrigue v. Aetna Cas. & Surety Co.*, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969).

**3.**

■ Louisiana Civil Code Article 2315 (1870) provides in pertinent part that:

"Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

Article 2315 has been interpreted to impose upon a property owner or one who has custody or control of property, the duty, owed to all persons rightfully on his property, to discover all reasonably discoverable defects on his property and either to correct them or to warn the invitee. See *Simoneaux v. Copolymer Rubber*, 189 So.2d 745 (La.App.1966). Breach of this duty constitutes negligence. *McIlwain v. Placid Oil Co.*, 472 F.2d 248 (5th Cir.1973). The evidence in this case supports the conclusion that the decedent slipped and fell from a walkway or catwalk which was on the main deck of D Structure and which had no guardrails. Both Dresser and Chevron knew or should have known of the absence of guardrails on this walkway. Neither took any steps to restore the rails or post any warning advising of their absence. The Court finds that both defendants breached the duty which they owed the decedent and as such are jointly liable under Articles 2315 and 2316 of the Louisiana Civil Code.

4.

■ In addition to liability under Louisiana Civil Code Article 2315, the defendant Chevron Oil Company is liable as the owner of the platform for violating safety rules and regulations applicable to fixed offshore platforms located on the Outer Continental Shelf.

The Secretary of the Treasury has delegated to the Commandant of the United States Coast Guard the authority to prescribe and administer certain regulations with respect to safety equipment and other matters relating to the promotion of safety on fixed structures located on the Outer Continental Shelf. See 33 C.F.R. §§ 140.-011, 140.015 (1976).

The pertinent regulations are as follows:
"Subpart 143.15—Guards and Rails
"Section 143.15–1 Floor or Deck Areas and Openings
"(a) Except for helicopter landing decks which are provided for in paragraph (b) of this section, and areas not normally occupied, the unprotected perimeter of all floor or deck areas and openings shall be rimmed with guards and rails or wire mesh fence. . . ." 33 C.F.R., Section 143.15–1(a).
"Section 143.15–5 Catwalks and Stairways.
"Each catwalk and each stairway shall be provided with a suitable guard rail or rails, as necessary." 33 C.F.R., Section 143.15–5.

The decedent, Gerald Duane Evans, fell from the main deck to a boat landing some 40 to 60 feet below. Prior to his fall he and his fellow employee, Lee Roe Brown, were working on the main deck. The main deck is an area normally used or occupied by individuals performing work on the structure. The decedent fell when he attempted to walk around a building which was on the main deck. There was a catwalk around the building obviously there to permit individuals to walk around the building. This catwalk, however, did not have guardrails. This was a violation of the abovementioned regulations. The absence of guardrails proximately caused the decedent's demise.

■ Chevron, as the owner of a fixed offshore oil platform, had a non-delegable duty to abide by the safety rules and regulations promulgated by the Secretary of Treasury or the United States Coast Guard for fixed offshore structures. *See Armstrong v. Chambers & Kennedy*, 340 F.Supp. 1220 (S.D.Tex.1972); *In re Dearborn Marine Service, Inc.*, 499 F.2d 263 (5th Cir.1974). Chevron breached this duty, and, therefore, is liable for the damages resulting from the decedent's demise.

5.

■ The defendants claim that the decedent's fatal injuries were caused by his own fault. Under Louisiana law, contributory negligence on the part of the injured or deceased party bars recovery. The defendants have the burden of proving contributory negligence on the part of the decedent.

■ No one witnessed the decedent's fall. The rule of law recognized in Louisiana and in the majority of other jurisdictions is that

when a plaintiff's lips are sealed because of death or disability, a rebuttable presumption arises that he complied with the law in every respect in all of his actions prior to the accident. *Globe Indemnity Co. v. Richerson*, 315 F.2d 3 (5th Cir.1963); *Parsons v. Blount Bros. Construction Co.*, 281 F.2d 414 (6th Cir.1960); *Eastern Air Lines v. Union Trust Co.*, 95 U.S.App.D.C. 189, 221 F.2d 62 (1955); *U. S. v. Wibye*, 191 F.2d 181 (9th Cir.1951); *Stansbury v. Mayor & Councilmen of Morgan City*, 228 La. 880, 84 So.2d 445 (1955). See also, Speiser, *Recovery for Wrongful Death*, Section 12:8, P. 695 (1966).

▮ This presumption that the decedent used due care for his personal safety is applicable. The defendants have failed to sustain their burden of proving the decedent was contributorily negligent, and I find no contributory negligence.

### 6.

As the Court finds that *both* defendants were negligent, and that their negligence proximately caused the decedent's fatal injuries, the defendants are liable jointly and in solido for all damages recoverable under Louisiana and Federal law.

### 7.

For the year prior to his death, Gerald Duane Evans earned $262.50 per week or a total of $13,650 per year. The Court feels it fair and equitable to use that figure as a basis for determining the future wage loss. The decedent was survived by his widow and one child. At the time of decedent's death the child was nearly three years old. The Court has found that the decedent used and would have used $150 per month of his wage for his own use until his child was 21 years old. Thereafter, for the remaining portion of his work life expectancy, the Court feels it fair and equitable to assume that the decedent would have used $450 per month or $4,500 of his annual earnings for himself, leaving $8,750 per year for his widow.

▮ These figures, of course, should be reduced to present value utilizing a discount rate of 6%. Under *Rodrigue v. Aetna Cas. & Surety Co.*, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969), the applicable law is the law of Louisiana. Under Louisiana law the decreasing purchasing power of the dollar due to inflation in the future is a proper subject for consideration. *See Edwards v. Sims*, 294 So.2d 611 (La.App.1974); *Morgan v. Liberty Mutual Ins. Co.*, 323 So.2d 855 (La.App.1975). Based on the evidence, a 4% inflationary rate is reasonable and will be used. Thus, the plaintiff's future wage losses will be reduced by a net 2%, i. e., 6% (reduction to present value rate) less 4% (inflation) or a net 2%. Based on the above, the Court finds the loss of wages to be as follows:

1. Present Lost Wages:

   $11,850 from 7/24/68 (date of death) to 3/12/77 (date of trial) with 4% inflation ........ $128,155.00

2. Future Loss of Wages:

   a) $11,850 per year from 3/12/77 (date of trial) to 9/24/86 (date child reaches 21 years of age), discounted at 2% ............. $101,582.00

   b) $8,250 per year from 9/24/86 (date child reaches 21) to 9/7/2012 (date decedent would have reaches 65 years of age), discounted at 2% ............. $141,523.00

   TOTAL PRESENT AND FUTURE LOST WAGES ................. $371,260.00

▮ The Court is aware that the plaintiff, Jackie Elaine Moss Evans, has remarried since the death of her husband. This fact, however, has no effect on reducing or mitigating damages in a wrongful death action. *See McFarland v. Illinois Central R. R.*, 241 La. 15, 127 So.2d 183 (1961); *Dark v. Brinkman*, 136 So.2d 463 (La.App. 1962); Speiser, *Recovery for Wrongful Death*, § 6:13, P. 683 (2d Ed.1975).

### 8.

▮ In addition to the economic loss, the evidence supports an award for loss of society. Mrs. Evans' testimony and the testimony of her sister reveal that Mr. Evans had a close relationship with his wife and child. He supported them, lived with them and spent his leisure time with them. An award of $25,000 for Mrs. Evans and $25,-

000 for Mr. Evans' child is reasonable and will be allowed. *Higginbotham v. Mobil Oil Corp.*, 360 F.Supp. 1140 (W.D.La.1973).

9.

■ The decedent's burial expense amounted to $3,118.68. This item of damage is recoverable from the defendants. *Dennis v. Central Gulf Steamship Corp.*, 323 F.Supp. 943 (E.D.La.1971).

10.

■ As a result of the decedent's death, Debbie Darlene Evans, the decedent's child, lost care, guidance and nurture, which she would have received from her father had he lived. It is reasonable to award $750 per year for 18 years, or a total of $13,500. This item is recoverable in addition to loss of society. See *Hamilton v. Canal Barge Co., Inc.*, 395 F.Supp. 978 (E.D.La.1975).

11.

■ In addition to the above elements of damage the evidence supports the conclusion that the plaintiff was alive at the time of his fall and died sometime *after* he hit the boat landing. Mr. Brown testified that it was approximately 25 minutes between the time he last saw the decedent alive and the time he next saw him on the boat landing. The expert testimony of the coroner who performed the autopsy on the decedent explained that the body contained blood in the pleural cavity, which proved that the heart continued to beat after Mr. Evans hit the boat landing. Thus, Mr. Evans was alive after he hit the boat landing. By measuring the amount of blood and detecting its source—some ruptured blood vessels—the coroner was able to compute the time that Mr. Evans' heart continued to function after he hit the landing, which he estimated at near 20 minutes. The coroner also testified that the autopsy revealed that the brain was not substantially damaged, and, therefore, in his opinion Gerald Duane Evans was capable of feeling pain for about two-thirds of the time it took him to die, approximately 15 minutes. During this period of time Mr. Evans remained alone and in pain until he eventually succumbed when his lungs, pressed by the blood which infil-trated his pleural cavity, could not longer function, causing him to suffocate to death. This evidence has not been rebutted and remains uncontroverted. For the pain and suffering decedent sustained prior to the time of his death an amount of $10,000 will be allowed. See *Law v. Sea Drilling Corp.*, 510 F.2d 242 (5th Cir. 1975).

12.

The plaintiff's damages may be summarized as follows:

| | |
|---|---|
| Wage Loss | $371,260.00 |
| Loss of Society for Child | 25,000.00 |
| Loss of Society for Widow | 25,000.00 |
| Loss of Nurture for Child | 13,500.00 |
| Burial Expense | 3,118.68 |
| Pain and suffering of decedent prior to his death | 10,000.00 |
| TOTAL | $447,878.68 |

Accordingly, the defendants, Chevron Oil Company and Dresser Offshore Services, Inc., are held liable to the plaintiff, jointly and in solido, for the above stated sum.

13.

■ In addition to the main demand by plaintiff against the defendant, Chevron Oil Company and Dresser Offshore Services, Inc., Dresser has impleaded Evans' employer, Houma Welders, Inc., alleging the existence of an indemnity contract between Houma Welders and Dresser. The evidence does not support the existence of such a contract. The Court concludes that there was no indemnity contract between Houma Welders and Dresser.

■ The third party complaint of Chevron Oil Company against Dresser Offshore Services, Inc., seeking indemnity under the terms of the contract between these parties will be denied. The express terms of the contract between Dresser and Chevron clearly indicate that any claim of indemnity for attorneys' fees and costs is predicated upon a finding that the "contractor", *viz.*, Dresser, was the sole tort-feasor, which is not the situation existing here. This claim is simply without merit.

The Clerk shall prepare judgment accordingly.