Mrs. Anna Catherine CRABTREE,
Plaintiff,

v.

MARTIN EXPLORATION COMPANY
et al., Defendants.

Civ. A. No. 77–2450.

United States District Court,
E. D. Louisiana.

Sept. 6, 1979.

August J. Bubert, Metairie, La., for plaintiff.

Wood Brown, III, New Orleans, La., for defendant Employers Mut. Liability Ins. Co. of Wisconsin.

James S. Arceneaux, Metairie, La., for defendants Commercial Union Ins. Co. and Superior Casing Crews, Inc.

Timothy J. McNamara, Lafayette, La., for defendants Martin Exploration Co. and Highlands Ins. Co.

CASSIBRY, District Judge.

## I. INTRODUCTION

Martin Exploration Company (Martin) hired A. W. Eggleston, Inc. (Eggleston) to conduct drilling operations on a tract of land in Sunshine, Louisiana. In doing so, Eggleston utilized a movable drilling rig called Eggleston # 6. In August, 1976, the well being drilled by that rig was nearing

completion. Casing had to be installed. Casing is pipe of a large diameter that is fitted around the narrower production tubing that actually carries hydrocarbons to the surface. Casing is usually installed, or "run," by a company specializing in this activity. Martin hired Superior Casing Crews, Inc. (Superior) to run the casing for the well at Eggleston # 6. While that casing was being run, the plaintiff's decedent, a Superior employee, was killed.

In its present posture, this action involves only a few parties. The plaintiff is the decedent's mother. She seeks damages from Eggleston (and its insurer) for her son's death. She also seeks benefits under Louisiana's workmen's compensation laws from her son's employer and its compensation insurer. That compensation insurer, Commercial Union Insurance Company, seeks to recover from Eggleston (and its insurer) $1,500.00 that it paid in funeral benefits for the deceased.

## II. THE FACTS

At the time of the accident, Louis Castell was the highest-ranking Eggleston employee on the rig site. He was the driller, second in command only to the pusher. Several other Eggleston employees were on the rig, as was the Superior crew. That crew was headed by its pusher, Grant Odom. The decedent, Tommy Crabtree, was the stabber of the crew that day. Three other members of the Superior crew were present. They were Bobby Joe Smith, Ronald Billiot and Phillip Bridges.

The casing operation at Eggleston # 6 was being performed in the following manner. The Eggleston driller, Louis Castell, was at the main instrument console operating the source of power on the rig, the drawworks. Directly across the drill floor from Castell was the v-door, which was the opening through which the casing pipe was brought from the ground to the drill floor by means of the air hoist. Once through the v-door, each length of pipe was lifted into a vertical position by means of a cable running off the traveling block.

While the pipe was thus suspended vertically, it had to be guided from above into position with the previous piece of casing. That job was performed by a person known as the stabber. He carried out this task from a platform known as the stabbing board. The stabbing board was a metal platform. Metal pipes several feet high rose from each of the four corners of the platform. Horizontal metal pipes connected these vertical pipes along three sides of the platform, forming guard rails. Rope connected the vertical pipes along the fourth side. The stabbing board was entirely open at the top. While standing on this platform, the stabber could manipulate the casing pipe from a point well above the drill floor.

The casing being run at Eggleston # 6 varied from 22 to 40 feet in length. To accommodate these different lengths of pipe, the board could be moved to various heights. The board was permanently attached to a short piece of pipe. That pipe, in turn, circled a long, stationary piece of pipe called a runner. The stabbing board and short pipe ran up and down the runner, thus enabling the board to reach different heights. To fix the board at a given height, a pin was inserted through the short pipe into the runner. The short pipe and the runner had holes drilled in them for this purpose. The pin was removed when it was time to move the board and short pipe up or down.

This movement up or down was controlled by the catline. A cable was attached to the board. It ran up and through a pulley near the top of the derrick, then down toward a device known as the cathead. The cathead was a rotating drum connected to and powered by the drawworks. Near the cathead, the cable was tied to a length of manila rope, which passed through another pulley mounted on the side of the cathead. By wrapping the rope around the cathead and increasing the friction between the rope and that rotating drum, the stabbing board and short pipe could be raised. By loosening the slack on the rope, such upward progress could be stopped. By loosening the slack still more, the board and short pipe could be lowered.

The rotation of the cathead could be stopped only by throwing the drawworks itself out of gear by means of the master clutch lever on the driller's console. The person tending the catline at the cathead could not stop the cathead's rotation. Nor could the stabber on the stabbing board.

The catline and cathead are often used on rigs such as Eggleston # 6 to lift various objects. This mechanism, however, is subject to the catline "balling-up," or jamming, while engaged with the rotating head. When a ball-up occurs, the catline is reeled in by the rotating cathead until that rotation is stopped by throwing the master clutch lever. The object attached to the catline is raised until the cathead stops rotating.

Tommy Crabtree was killed when such a ball-up occurred. He was riding the stabbing board while Grant Odom was tending the catline. Odom was attempting to raise the board. Castell was at the driller's console operating the drawworks to bring a piece of casing pipe through the v-door. The drawworks were operating at high speed. The catline balled-up, and the rapid rotation of the cathead raised the stabbing board upward at an extremely fast rate. The board, with Crabtree on it, shot over the top of the runner, breaking through the chain or rope fastened there. At about that time, the catline had reeled in all the rope, and the cable separated from the rope when it was brought into contact with the pulley on the side of the cathead. The board and the decedent plummeted to the drill floor.

### III. PLAINTIFF'S CLAIM AGAINST EGGLESTON

Plaintiff's action against Eggleston rests on both negligence and strict liability grounds. For the reasons stated below, I find that Eggleston was negligent. Therefore, the strict liability claims will not be reached.

### A. EGGLESTON'S NEGLIGENCE

█ Martin was the employer of Superior. Since Martin did not request that Superior bring its own stabbing board arrangement, Superior did not do so and planned to use one provided by Eggleston. A casing crew will usually rely on the stabbing board arrangement supplied by the drilling contractor unless specifically requested to bring one. Drilling contractors expect to supply the stabbing board arrangement to be used by the casing crew. It is a customary practice in the industry. In the instant case, all the equipment involved in the stabbing board arrangement was owned by Eggleston and had been set up by Eggleston prior to the arrival of the Superior casing crew. Accordingly, Eggleston owed a duty to the Superior casing crew to provide a reasonably safe stabbing board arrangement. See generally Evans v. Chevron Oil Co., 438 F.Supp. 1097, 1102–03 (E.D. La. 1977); Shelton v. Aetna Casualty & Surety Co., 334 So.2d 406, 410 (La. 1976).

Eggleston failed to do so in this case. The stabbing board arrangement it provided at Eggleston Rig # 6 was inherently and unreasonably unsafe. Considering the exposure to serious injury of the persons using and working around the stabbing board, Eggleston did not act reasonably in supplying the stabbing board arrangement at issue in this case.

Despite testimony to the contrary, I find that it was the usual practice at Rig # 6 both for the stabbing board to be raised or lowered while the drawworks were powering the lifting of casing pipe into the v-door, and for the stabber to ride the board while it was thus being raised or lowered. The driller not only knowingly acquiesced in this practice, but affirmatively contributed to it. At this drill site, the adage "time is money" was strictly followed. The driller expected the stabber to be in position to stab each piece of casing by the time the driller raised it to a vertical position. Because the casing varied in length from piece to piece, the board had to be moved while each piece was being raised. If the stabber were to leave the board and climb through the derrick to reach the position to which the board, without him on it, were raised or lowered each time, that would consume considerable extra time. If the stabber were

to ride the board to its new position alongside each piece of pipe after that piece had already been lifted to a vertical position, that too would consume considerable extra time. Thus, the established practice which the driller desired and expected to take place was for the stabber to ride the board to its new position while each piece of pipe was being lifted to a vertical position.

The catline and cathead arrangement on Rig # 6, however, was unsuitable for constant raising and lowering of a platform with a person on it under those circumstances. Ball-ups in a catline are not infrequent. They can occur even when the person tending the line is exercising care. On Rig # 6, however, the only way to prevent the consequences of a ball-up was to throw the entire drawworks out of gear. That could be accomplished only from the driller's console. The person tending the catline, who would be the first to see a ball-up, could not stop the rotation of the cathead from his position. The stabber on the board, who would immediately feel the consequences of a ball-up, could not stop the rotation of the cathead from his position either.

The driller, though, could not see the cathead directly from his console. To do so, he had to take a step back and look to his left around a pole. Moreover, when pipe is being brought through the v-door, his attention is properly directed toward that area, away from the cathead. Castell, however, did not employ one of his crew as a look-out to watch for and signal him in case of trouble in areas, like the cathead, that he could not see directly. Thus, in the event of a ball-up at the cathead while pipe was being brought through the v-door, the only persons likely to know of the ball-up right away—the catline tender and the stabber—would have to communicate somehow with the driller, who would then have to throw the proper lever. Or the cathead tender would have to move to the driller's console and find and throw the lever himself.

Since the drawworks (and hence the cathead) are frequently operated at high speeds, these delays in stopping the rotation of the cathead are crucial. Given this entire stabbing board arrangement at Rig # 6, a serious accident was inevitable once a ball-up occurred.

The various dangerous features of this stabbing board arrangement at Rig # 6 came into play in the decedent's accident. Odom was starting to lift the board to a higher elevation. The ball-up occurred. Neither Odom nor Crabtree could stop the cathead. Only someone at Castell's console could do so. By the time Castell, at the console, learned about the ball-up when Odom screamed, the board was at or near the top of the runner. At that time, all of the manila rope had been reeled in by the cathead, and the cable separated from the rope at the pulley located on the cathead. It would have taken, at the least, four seconds for the cathead to have stopped rotating after Castell threw the proper level. Allowing a moment for him to react, I find that he could not have acted in response to Odom's scream to prevent the accident. He left the console, reasonably fearing that the board would fall onto that area of the drill floor. Odom went to the console and tried to find the master clutch lever, but he would have been far too late even if he could have found it.

Accordingly, Eggleston's negligence with regard to the stabbing board arrangement at Rig # 6 caused Tommy Crabtree to be killed. Eggleston should have either taken additional steps to make the use of the cathead/catline method reasonably safe, or provided a different, safer method altogether. As it was, due to Eggleston's conduct, the stabbing board arrangement at Rig # 6 was a death trap that caught the decedent.

### B. CONTRIBUTORY NEGLIGENCE

■ Eggleston urges that the decedent's contributory negligence should bar recovery by his mother in this case.[1] It the decedent knowingly and voluntarily encountered the risks created by Eggleston's negligence at Rig # 6. *Langlois v. Allied Chemical Corp.*, 258 La. 1067, 249 So.2d 133, 141 (1971).

---

1. Eggleston also appears to assert assumption of the risk on the part of the decedent. This contention, like that of contributory negligence discussed in the text, cannot be upheld. Eggleston did not prove, as a subjective matter, that

finds such contributory negligence in two particulars: Crabtree's failure to wear his safety belt at the time the catline balled-up and sent the board upward, and Crabtree's presence on the stabbing board while it was being raised.

Crabtree cannot be faulted for riding the stabbing board while it was being raised. As described earlier, this was the practice established by Eggleston and Superior at Rig # 6. It was the quickest and most cost-efficient method of stabbing. Tommy Crabtree, therefore, was just doing the job he was told to do. Given the equipment Eggleston had provided, Crabtree's only alternative was to climb through the derrick while the board was raised or lowered without him to its new position. That too would have been extremely dangerous. It also would have taken more time, and, given the emphasis at Rig # 6 on saving time, this alternative was not readily available to Crabtree. He acted reasonably in this regard. *Galloway v. Employers Mutual of Wausau,* 286 So.2d 676, 683–85 (La. App. 4th Cir. 1974). *See Hall v. Hartford Accident & Indemnity Co.,* 278 So.2d 795, 799 (La. App. 4th Cir. 1973), *writ denied* 281 So.2d 753 (1973); *Chaney v. Brupbacher,* 242 So.2d 627, 632 (La. App. 4th Cir. 1970).

With regard to the other alleged ground of contributory negligence, Eggleston has failed to prove that Crabtree was not wearing his safety belt at the time the ball-up occurred and sent the board upward. Grant Odom testified convincingly that just before the ball-up, when Crabtree bent down to release the pin to allow the board to be raised on its final ascent, he was wearing his safety belt. The belt was attached to a safety line that was tied to the bridal line in the derrick. Odom was the person in the best position to observe Crabtree. Since he was controlling the device that would raise the stabber once the pin was pulled, he had reason to observe Crabtree carefully at this moment.

Eggleston must establish the affirmative defense of contributory negligence by a preponderance of the evidence. *Langlois v. Allied Chemical Corp.,* 258 La. 1067, 249 So.2d 133, 141 (1971). The evidence in Eggleston's favor is the fact that when Crabtree's body hit the drill floor after the accident, it did not have the safety belt around it. However, the belt might well have broken or pulled away from Crabtree's body at some time during the ascent or subsequent fall of the board. In light of the direct testimony indicating that Crabtree was wearing the belt at the time of the ball-up, Eggleston has not proved to the contrary.

Moreover, even if I were to find that Crabtree was not wearing his safety belt when the ball-up occurred and the board began to ascend, I would find that his failure to do so did not cause or contribute to his death and thus does not bar recovery by his mother in this action. As Grant Odom testified, the safety belt system was designed to protect the stabber only in case of a rapid descent by the stabbing board. That is, the safety line would hold onto the stabber if the board, which was open at the top, fell out from under him. In the case of a rapid ascent, however, the safety line, once it became taut, would tend to hold the stabber down while the board under him was moving up. The stabber might be crushed against the metal guard rails on the stabbing board. Or, in the face of the board's upward thrust, the safety line might break during the board's ascent. Even if it did not break, if the stabber and board went off the top of the runner, the stabber would fall a considerable distance, and then his fall would be stopped abruptly by the safety line. All of these possibilities involve considerable risk to the stabber. Thus, the safety belt system was not intended to prevent injury or death to the stabber in the case of a ball-up like the one that occurred in the instant case. Even if I were to find that Crabtree was not wearing his belt at the time of the ball-up, there is insufficient causal connection between his

neglect and his injury to bar recovery by his mother.

### C. DAMAGES

■ The plaintiff had seven sons, of whom the decedent was the youngest. She and her husband lived in Florida. In 1962, her husband died. Because her husband had been a farmer, Mrs. Crabtree did not receive social security benefits upon his death. At the time of Mr. Crabtree's death, only three sons were living with their parents and were dependent upon them for support. In descending order of age, they were Walter, Monte, and Tommy.

To support herself and those three sons, Mrs. Crabtree went to work at the St. Regis Paper Company until July 12, 1969, when she suffered a fall after which she could not return to work. Thereafter, she received social security benefits based on her own former employment, plus a small sum from a private St. Regis fund. To supplement Mrs. Crabtree's fixed income, the eldest son remaining at home, Walter, went to work. He contributed to the family's support until he married, at which time the burden of support passed to the eldest unmarried son, Monte, who quit school and went to work. When Monte was drafted into the armed services, his ability to support the family diminished. Monte married soon after leaving the armed services, and the burden of support then rested on Tommy. Tommy was then 18. He finished high school and went to work in Florida. At age 20 he went to Louisiana in search of more lucrative employment. From the money he made at work, he helped support his mother until he died.

At the time of Tommy's death, Mrs. Crabtree had an income of $279.49 per month—$258.10 from social security and $21.39 from St. Regis. Her expenses totalled approximately $533.00. The difference of $253.51 per month was made up by Tommy's contributions.

Mrs. Crabtree is currently 64 years old. Her life expectancy is 18 years. As damages for loss of support, she claims the $253.51 per month that she had been with-

out between Tommy's death in August 1976 and the present time, a total of 37 months, or $9,379.87. She also claims $253.51 per month for the remaining 18 years of her life. She overlooks, however, that Tommy's support for her would have diminished or stopped in the event of his marriage. He was 23 years old when he died. Little evidence was presented on this point, but I find it unlikely that Tommy would have remained unmarried for 18 years. Considering this, and considering the uncertainty as to how much, if at all, he would have contributed to his mother once he married, I find the sum of $25,000.00 to be appropriate compensation for Mrs. Crabtree's loss of future support. That sum represents a discounted figure, and was calculated on the basis of a 4% discount rate. Accordingly, the total award for loss of support is $34,-379.87.

Mrs. Crabtree is also entitled to damages for her grief and the loss of the love, affection, and companionship of her son. Mrs. Crabtree was close to her youngest son, Tommy. He visited her in Florida approximately once a month. He maintained his home with her, although he worked and resided in Louisiana. I find the sum of $40,000.00 to be a proper award for Mrs. Crabtree's grief and the loss of her son's love, affection, and companionship.

Mrs. Crabtree proved funeral and related expenses in the amount of $750.00. She is entitled to recover these expenses.

Another element of damages that Mrs. Crabtree claims here is an award for the decedent's own pain and suffering. Tommy Crabtree died upon impact with the drill floor, but he was conscious during the stabbing board's ascent and subsequent fall. Tightly clutching the guard rail of the stabbing board, Tommy appeared extremely frightened. His mother should receive $20,-000.00 for Tommy's conscious pain and suffering before his death.

### IV. PLAINTIFF'S CLAIM AGAINST SUPERIOR AND COMMERCIAL UNION

■ Plaintiff has indicated that, in the event of a decision in her favor against

Eggleston, any amount of compensation awarded to her would have to be returned to Superior's compensation insurer because of its right of subrogation. Accordingly, plaintiff's claim against Superior and Commercial Union now consists only of one for attorney's fees due to their allegedly arbitrary refusal to pay Mrs. Crabtree any benefits above the statutory amount of $1,500.00 for funeral expenses. This refusal was based on a belief that Mrs. Crabtree was not dependent on the decedent. Although I have found that Mrs. Crabtree was thus dependent, I cannot find that this refusal was arbitrary. Plaintiff shall have no recovery against Commercial Union.

## V. COMMERCIAL UNION'S CROSS–CLAIM AGAINST EGGLESTON

Commercial Union is subrogated to the rights of the plaintiff to the extent of the $1,500.00 that the parties stipulated it paid for funeral expenses. Commercial Union should recover this amount from Eggleston.

For the foregoing reasons, there should be judgment in favor of plaintiff against Eggleston (and its insurer) in the amount of $95,129.87, and in favor of Commercial Union against Eggleston (and its insurer) in the amount of $1,500.00.